IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHICAGO BRIDGE & IRON COMPANY N.V., | § § § | No. 573, 2016 |
| Plaintiff Below, Appellant, | § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § § | C.A. No. 12585 |
| WESTINGHOUSE ELECTRIC COMPANY LLC and WSW ACQUISITION CO., LLC, | § § § § | |
| Defendants Below, Appellees. | § § | |

Submitted: May 3, 2017
Decided: June 27, 2017
Revised: June 28, 2017

Before **STRINE**, Chief Justice; **VALIHURA** and **SEITZ**, Justices.

Upon appeal from the Court of Chancery. **REVERSED**.

David E. Ross, Esquire, Garrett B. Moritz, Esquire, Ross Aronstam & Moritz LLP, Wilmington, Delaware; Theodore N. Mirvis, Esquire (*argued*), Jonathan M. Moses, Esquire, Kevin S. Schwartz, Esquire, Andrew J.H. Cheung, Esquire, Cecilia A. Glass, Esquire, Bita Assad, Esquire, Wachtell, Lipton, Rosen & Katz, New York, New York, for Plaintiff Below, Appellant, Chicago Bridge & Iron Company N.V.

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware; Peter N. Wang, Esquire (*argued*), Susan J. Schwartz, Esquire, Yonaton Aronoff, Esquire, Douglas S. Heffer, Esquire, for Defendants Below, Appellees, Westinghouse Electric Company LLC and WSW Acquisition Co., LLC.

**STRINE**, Chief Justice:

In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract. That is true in all commercial contexts, but especially so when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business.

In this case, Chicago Bridge & Iron Company N.V. ("Chicago Bridge") and Westinghouse Electric Company ("Westinghouse") had an extensive collaboration and complicated commercial relationship involving the construction of nuclear power plants by Chicago Bridge's subsidiary, CB&I Stone & Webster, Inc. ("Stone"), including two which would be the first new nuclear power plants in the United States in thirty years. As delays and cost overruns mounted, this relationship became contentious. To resolve their differences, Chicago Bridge agreed to sell Stone to Westinghouse. The agreement to do so was unusual in a few key respects. First, the purchase price to be paid at closing by Westinghouse was set in the contract at zero,[1] a figure in Yiddish that, perhaps appropriately given Chicago Bridge's Chicago connection, sounds like an iconic linebacker. The parties came to that figure in part by considering Stone's historical financial statements and management projections and by basing it upon a target for Stone's net working capital—its current

---

[1] App. to Appellant's Opening Br. at A64 (Verified Complaint, dated July 21, 2016 Ex. A, Purchase Agreement by and Among Chicago Bridge & Iron Company N.V., as Seller Parent, CB&I Stone & Webster, Inc., as the Company, WSW Acquisition Co., LLC, as Purchaser, and Westinghouse Electric Company LLC, as Purchaser Parent § 1.2(a)(i)) [hereinafter Purchase Agreement].

assets less current liabilities—of $1.174 billion. That target is referred to in the Purchase Agreement as the "Target Net Working Capital Amount," and we will refer to it as "the Target" for short.[2] The parties also agreed Chicago Bridge might receive certain payments at closing if project milestones were met by that time or at a later date through an earnout provision.[3] Given the difficulties with the nuclear projects, it was likely that no money would change hands at closing, or, that after closing, the only money to change hands would be the amount constituting the difference between Stone's actual net working capital as of closing and the Target. In other words, if the value of Stone's working capital stayed at the Target as of the time of closing, Chicago Bridge would receive zero. If the value of Stone's working capital was different from the Target, Chicago Bridge would owe the delta if the difference was negative, and Westinghouse would owe the delta if the difference was positive. We refer to the process the Purchase Agreement sets out for calculating these payments as the "True Up" and the resulting price including the delta as the Final Purchase Price.[4] So, at closing, Westinghouse would get Stone and might have to

---

[2] *Id*. at A130 (§ 11.1) (defining Target Net Working Capital Amount).

[3] *Id*. at A65 (§ 1.3); *id*. at A149 (Sch. 1.3(c)).

[4] The Purchase Agreement uses both "Final Purchase Price" and "Closing Date Purchase Price." It defines "Closing Date Purchase Price" as the zero dollar starting point adjusted by the True Up's delta and transaction expenses. *Id*. at A64 (Purchase Agreement § 1.2(a)(i)). And, the "Final Purchase Price" is defined as the Closing Date Purchase Price "as finally determined pursuant" to § 1.4's dispute resolution procedures. *Id*. at A67 (§ 1.4(d)). For most humans, the term Final Purchase Price is clearer and we use it to refer to whatever the ultimate purchase price turned out to be.

2

make a payment to Chicago Bridge, to account, for example, for the expectation that Chicago Bridge would make substantial capital expenditures before closing so Stone's construction projects could continue. This was almost certain because the Purchase Agreement contained a covenant requiring Chicago Bridge to continue to run Stone, a construction firm, in the ordinary course of business until closing. But, regardless, Chicago Bridge would not be walking away from the deal with a check in hand constituting anything one could call sale profits in the colloquial sense of that term.

Second, and important for understanding how this zero purchase price made commercial sense, although Chicago Bridge was only selling a subsidiary and would carry on business after the transaction concludes, Westinghouse agreed that its sole remedy if Chicago Bridge breached its representations and warranties was to refuse to close, and that Chicago Bridge would have no liability for monetary damages post-closing (the "Liability Bar"). Furthermore, Westinghouse agreed to indemnify Chicago Bridge for "all claims or demands against or Liabilities of [Stone]."[5] The agreement was also predicated on Chicago Bridge obtaining liability releases from the power utilities that would ultimately own the nuclear plants being built in the United States.[6] Thus, this transaction gave Chicago Bridge a clean break from the

---

[5] *Id*. at A112, A115 (§§ 10.4, 11.1).
[6] *Id*. at A110 (§ 8.3(c)).

spiraling cost of the nuclear projects. That view of the overall transaction is buttressed by the Westinghouse CEO's apparent description of the transaction as a "quitclaim."[7] In other words, although Chicago Bridge was to get no profit from the sale at the time of closing and had little likelihood of any future upside through the earnout, it also got to walk away and not worry about the projects.

The True Up also contained provisions to settle any disputes over the Final Purchase Price by referring them to an independent auditor who was to act "as an expert and not as an arbitrator,"[8] had to issue its decision in the form of a "brief written statement" in an expedited time frame of 30 days, and had to rely on the parties' written submissions as the sole basis for its decisions.[9]

In contesting Chicago Bridge's calculation of the Final Purchase Price, Westinghouse asserted that Chicago Bridge, which had been paid zero at closing and had invested approximately $1 billion in the plants in the six months leading to the December 31, 2015 closing, owed it nearly $2 billion! As Westinghouse admits, the overwhelming percentage of its claims are based on the proposition that Chicago Bridge's historical financial statements—i.e., the very ones on which Westinghouse could make no post-closing claim—were not based on a proper application of generally accepted accounting principles ("GAAP"). By way of example, Chicago

---

[7] *Id*. at A11 (Verified Compl., dated July 21, 2016 ¶ 2).
[8] *Id*. at A67 (Purchase Agreement § 1.4(c)).
[9] *Id.* at A66–67 (§1.4(c)).

Bridge had historically booked as an asset certain large claims it had against Westinghouse for construction costs Chicago Bridge incurred on their joint nuclear projects, claims that Westinghouse obviously knew about and that were among the reasons principally motivating the transaction. Westinghouse now argues that those claims were not accounted for in Stone's financial statements in accordance with GAAP. But, although Westinghouse says it believed that to be true before closing, Westinghouse, which had the right to refuse to close if Chicago Bridge had breached its representations and warranties, chose to close anyway. Westinghouse then raised this and other claims that were dependent on proving that the accounting practices that undergirded the financial statements on which no claims could be brought post-closing were improper, but argued that it nonetheless could do so as part of the contractual True Up resulting in the Final Purchase Price.

After Westinghouse made these claims, Chicago Bridge and Westinghouse unsuccessfully attempted to resolve their differences. But, once it was clear that Westinghouse would seek to have the Independent Auditor require Chicago Bridge to pay over $2 billion to it based on contentions that Chicago Bridge's historical accounting practices were not GAAP compliant, Chicago Bridge filed this action seeking a declaration that Westinghouse's changes based on assertions that Stone's financial statements and accounting methodologies were not GAAP compliant are not appropriate disputes for the Independent Auditor to resolve when those changes

5

are, in essence, claims that Chicago Bridge breached the Purchase Agreement's representations and warranties and therefore are foreclosed by the Liability Bar. Westinghouse moved for judgment on the pleadings, arguing that the Purchase Agreement established a mandatory process for resolving the parties' disagreements. The Court of Chancery held for Westinghouse, reading the True Up as providing Westinghouse with a wide-ranging, uncabined right to challenge any accounting principle used by Chicago Bridge, however consistent that principle was with the ones used in the financial statements represented to be GAAP compliant, and empowering the expert to resolve that dispute in a truncated, rapid proceeding. We conclude that the Court of Chancery erred in interpreting the Purchase Agreement this way.

When viewed in proper context, the True Up is an important, but narrow, subordinate, and cabined remedy available to address any developments affecting Stone's working capital that occurred in the period between signing and closing. By way of example, the True Up emphasizes that net working capital should be determined using the same accounting principles that were used in preparing the financial statements represented by Chicago Bridge to be GAAP compliant. It does so by stating that working capital was "to be determined in a manner consistent with GAAP, consistently applied by [Chicago Bridge] in preparation of the financial

6

statements of the Business, as in effect on the Closing Date."[10] This language is in line with other pertinent language, which requires consistency with "past practices" and with the basic idea that the True Up is used to set a Final Purchase Price based on developments after the initial price of zero was set.[11] Thus, the True Up was tailored to address issues that might come up if Chicago Bridge tried to change accounting practices midway through the transaction or if it stopped work on the projects, rather than continue to invest as expected.

By reading the True Up as unlimited in scope and as allowing Westinghouse to challenge the historical accounting practices used in the represented financials, the Court of Chancery rendered meaningless the Purchase Agreement's Liability Bar. The Court of Chancery also slighted the requirement in the text of the Purchase Agreement that Westinghouse indemnify Chicago Bridge for a broad set of claims related to Stone. Not only that, it then subjected Chicago Bridge to unlimited post-closing liability by way of an expedited proceeding before an accounting expert who was charged with delivering a rapid decision based solely on written submissions of the parties.[12] By so interpreting the contract, the Court of Chancery failed to give adequate weight to the structure of the Purchase Agreement and the subordinate and confined purpose of the True Up. And, it failed to consider that the reason parties

---

[10] *Id.* at A164 (Sch. 11.1(a)).
[11] *Id.*
[12] *Id*. at A67 (§ 1.4(c)).

7

can hazard having an expert decide disputes in this blinkered, rapid manner is because when considering claims under the True Up, the expert is addressing a confined period of time between signing and closing using the same accounting principles that were the subject of due diligence and contractual representations and warranties, and thus formed the foundation for the parties' agreement to sign up and close the transaction.

We therefore reverse and require the entry of a judgment on the pleadings for Chicago Bridge. The Court of Chancery should declare that, under the Purchase Agreement, Westinghouse's arguments based on assertions that Chicago Bridge's historical financial statements and practices did not comply with GAAP may not be heard in proceedings before the Independent Auditor and should enjoin Westinghouse from submitting to the Independent Auditor or continuing to pursue already-submitted claims not based on changes in facts and circumstances between signing and closing.

## I.

### A.[13]

Chicago Bridge built nuclear power plants through its subsidiary Stone. Stone is an engineering and construction firm, with substantial experience in power

---

[13] The facts are taken from the pleadings and Purchase Agreement. "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the

generation projects, which Chicago Bridge purchased in 2013. Westinghouse designs nuclear power plants. In 2008, Westinghouse and Stone were hired as part of a consortium to build two nuclear power plants. One was to be built in Georgia and the other was to be built in South Carolina. Both plants would be cutting-edge AP1000 models designed by Westinghouse.[14] These would have been the first new nuclear power plants built in the U.S. in over thirty years and the first to be built under a new regulatory regime. Indeed, the relevant regulator did not approve construction of the reactors until 2012. The construction suffered from delays and material cost overruns, driven by various factors including regulator-driven design changes. This resulted in disagreements between Westinghouse and Chicago Bridge. To resolve those differences, they agreed that Westinghouse would acquire Stone from Chicago Bridge in exchange for, among other things, Chicago Bridge ceasing to have responsibility for the nuclear projects.

*B.*

Before they signed the Purchase Agreement, Chicago Bridge and Westinghouse held extensive negotiations. Chicago Bridge gave Westinghouse Stone's financials, including the June 30, 2015 balance sheet, "[n]ear the start of

---

non-moving party." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[14] Stone and Westinghouse also collaborated on AP1000 plants in China, but those projects, although part of the transaction, do not appear to have been material drivers of the present dispute. App. to Appellant's Opening Br. at A24 (Verified Compl., dated July 21, 2016 ¶ 27).

negotiations" in July 2015.[15] During negotiations leading to signing, Chicago Bridge and Westinghouse also agreed to a net working capital target of $1.174 billion—what we've been calling the Target—and that was referred to in documents like the August 13, 2015 "Aligned Positions" term sheet.[16] Through the True Up process, Chicago Bridge and Westinghouse would compare Stone's actual working capital to the Target and pay one or the other party to the extent the actual working capital differed from the Target. The result of the True Up would be added together with any earnout payments due at closing to comprise the Final Purchase Price. Thus, the Target was a basic building block of the exchange Chicago Bridge and Westinghouse were contemplating along with its zero value starting price.

As part of the documents prepared for signing, the parties prepared an example of the calculations they would exchange as part of the True Up: Schedule 1.4(f) of the Purchase Agreement. The Purchase Agreement defined the actual net working capital at closing (the "Net Working Capital Amount") as Stone's current assets less current liabilities "*solely* to the extent such assets and liabilities are described and set forth on Schedule 1.4([f])."[17] The calculation for the Target

---

[15] *Id*. at A25–26 (¶ 29).
[16] *Id*. at A28 (¶ 32).
[17] *Id*. at A126 (Purchase Agreement § 11.1) (emphasis added) (defining Net Working Capital Amount). The actual text of the definition refers to a Schedule 1.4(b), but that appears to be a typographical error. For one thing, the Purchase Agreement's table of contents does not list a Schedule 1.4(b), only a Schedule 1.4(f). *Id*. at A62 (Table of Contents). For another, Section 1.4(b) describes the procedure for Westinghouse to deliver its Closing Statement; in contrast, Section 1.4(f) covers the form of both the Closing Statement and Closing Payment Statement,

included accounts encompassing accounts receivable, the net Construction in Progress asset account which was comprised of completed but unbilled work and the "claim cost" asset, and accounts payable for the two nuclear projects. That Schedule uses the June 30, 2015 balance sheet Chicago Bridge represented was GAAP compliant.[18] The Schedule is fairly simple:

---

which are the full set of places where the Net Working Capital Amount is relevant. So, it is reasonable to conclude that the Purchase Agreement definition of Net Working Capital was meant to refer to Schedule 1.4(f) and the fact that it refers to a nonexistent Schedule should be treated similarly to a scrivener's error. *Deutsche Bank Nat'l Trust Co. v. Roslewicz*, 2014 WL 4559101, at *3 (Del. Ch. Sept. 2, 2014) ("Like a mutual mistake, a scrivener's error fails to reflect the intentions of the parties in the written instrument. An example of a scrivener's error is a 'minor typographical mistake, such as an incorrect address.'" (quoting *Envo, Inc., v. Walters*, 2009 WL 5173807, at *5 (Del. Ch. Dec. 30, 2009))).

[18] App. to Appellant's Opening Br. at A71 (Purchase Agreement § 2.6(a)).

## Schedule 1.4(f) – Sample Calculation of Net Working Capital Amount

**(adjusted to reflect the Business)**

**(in thousands)**

|  | Balance as of June 30, 2015 |
|---|---|
| **Assets:** | |
| Cash and Cash Equivalents | 416 |
| Accounts Receivable | 108,415 |
| Inventory | 0 |
| Prepaid Expenses | 5,049 |
| Costs and estimated earnings in excess of billings | 1,250,066 |
| Other Current Assets | 587 |
| **Total Current Assets** | 1,364,533 |
| | |
| **Liabilities:** | |
| Trade and accounts Payable | 211,934 |
| Accrued Expenses and other current Liabilities | 40,190 |
| Billings in Excess of costs and estimated earnings | 85,981 |
| **Total Current Liabilities** | 338,105 |
| | |
| **Estimated Net Working Capital Amount** | $1,026,428 |

Target Net Working Capital Amount (in thousands): $1,174,000

Difference between the Target Net Working Capital Amount and Estimated Net Working Capital Amount (in thousands): $147,572 [19]

Another way of putting it is this. Assume the parties decided to close retroactively to the June 30 financials or closed at a date when Stone's net working capital was exactly the same as on Schedule 1.4(f). If that was the case, Chicago Bridge would have owed Westinghouse around $147.5 million because Stone's working capital in the June 30 financials was that amount below the Target. So, the Target was

---

[19] *Id.* at A167 (Sch. 1.4(f)).

important because it was the benchmark value that the parties were to use in coming to the purchase price, which would have to account for, among other things, the reality that Chicago Bridge had to continue to spend around $1 billion on the nuclear projects before closing.

*C.*

On October 27, 2015, Chicago Bridge and Westinghouse signed the Purchase Agreement, which provided for a purchase price of $0 at closing,[20] subject to the post-closing adjustment True Up and with the potential for deferred consideration and earnout payments based on project milestones in the future:

> (a) The aggregate consideration for the purchase of the Transferred Equity Interests shall be an amount in cash equal to:
>
> (i) (A) $0, <u>less</u> (B) the Closing Indebtedness Amount, (C) (x) if the amount of the Target Net Working Capital Amount exceeds the Net Working Capital Amount, <u>less</u> the amount by which the Target Net Working Capital Amount exceeds the Net Working Capital Amount and (y) if the Net Working Capital Amount exceeds the Target Net Working Capital Amount, <u>plus</u> the amount by which the Net Working Capital Amount exceeds the Target Net Working Capital Amount, less (D) the Company Transaction Expenses (the amount resulting from the calculation in this <u>Section 1.2(a)(i)</u>, the "<u>Closing Date Purchase Price</u>"); <u>plus</u>
>
> (ii) any Deferred Purchase Price that becomes due and payable to Seller Parent or any of its Affiliates in accordance with this Agreement; <u>plus</u>
>
> (iii) any Net Proceeds Earnout Amounts that become due and payable to Seller Parent or any of its Affiliates in accordance with this Agreement; <u>plus</u>
>
> (iv) any Milestone Payments that become due and payable to Seller Parent or any of its Affiliates in accordance with this Agreement

---

[20] *Id*. at A64, A65 (§§ 1.2, 1.3).

13

(together with the Closing Date Purchase Price, Deferred Purchase Price and Net Proceeds Earnout Amounts, the "Aggregate Purchase Price").[21]

In exchange, Chicago Bridge would be released from all future liabilities related to Stone, and especially the two still-incomplete nuclear power plants. That release took the form of the Liability Bar,[22] indemnification by Westinghouse of Chicago Bridge,[23] and a condition to closing that the power utilities that would operate the plants sign agreements releasing Chicago Bridge from claims related to the construction of those plants.[24]

*i.*

Chicago Bridge made representations as part of the Purchase Agreement, including that Stone's financial statements for the year ending December 31, 2014 and as of June 30, 2015, had "been prepared in accordance with GAAP"[25] and that Stone had no undisclosed liabilities.[26] But, as has been discussed, Section 10.1 of the Purchase Agreement, what we have called the Liability Bar, stated that those representations, along with virtually all the other representations and warranties made by Chicago Bridge, would not survive closing[27] and Chicago Bridge would

---

[21] *Id.* at A64 (§ 1.2(a)).
[22] *Id.* at A111 (§ 10.1).
[23] *Id.* at A112 (§ 10.4).
[24] *Id.* at A110 (§ 8.3(c)).
[25] *Id.* at A71 (§ 2.6(a)).
[26] *Id.* at A71–72 (§§ 2.6(a), (e)); *id.* at A162 (Sch. 2.6(a)).
[27] The Seller Fundamental Representations and the Purchaser Fundamental Representations survive. *Id.* at A111 (§ 10.1); *id.* at A120 (§ 11.1) (defining "Fundamental Representations").

have "no liability for monetary damages after the Closing" absent actual fraud.[28]

Provisions like the Liability Bar are unusual. The American Bar Association Business Law Section M&A Market Trends Subcommittee's survey of private transactions completed in 2014 suggests virtually all private deals provided for some post-closing survival of representations and warranties.[29] Indeed, "[b]y far the most common matter with respect to which indemnities are given is a Seller's breach of the representations and warranties . . . rendered in the acquisition agreement in favor of the Buyer."[30] Section 10.3, however, carved out the True Up:

> This Article X shall not (i) operate to interfere with or impede the operation of the provisions of Section 1.4(c) providing for the resolution of certain disputes relating to the Final Purchase Price between the parties and/or by an Independent Auditor . . . .[31]

*ii.*

In contrast to the lack of indemnification of Westinghouse as buyer for post-closing breaches of the seller's representations and warranties, the Purchase

---

Those representations largely dealt with the authority of Chicago Bridge and Westinghouse to enter into the transaction. *Id*. at A128 (§ 11.1) (defining "Purchaser Fundamental Representations" and "Seller Fundamental Representations"); *id*. at A69, A70, A72, A84, A85, A86–87 (§§ 2.2, 2.3, 2.7, 2.23, 3.2, 3.5, 3.6, 4.2, 4.6).

[28] *Id.* at A111 (§ 10.1).

[29] Compendium of Selected Authorities Cited in Appellant's Opening Br. ex. 4 (2015 Private Target Mergers & Acquisitions Deal Points Study, M&A Market Trends Subcommittee, Mergers & Acquisitions Committee, American Bar Association Business Law Section 70 (2015)). The Subcommittee assessed survival based on what happened to "most" representations and warranties in an agreement: "certain representations and warranties may be carved out from these periods in order to survive for other specified periods." *Id*.

[30] Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions 15.02[1] (2016) (citations omitted).

[31] App. to Appellant's Opening Br. at A112 (Purchase Agreement § 10.3).

Agreement required Westinghouse to indemnify Chicago Bridge. This indemnification for claims related to Stone was broad: "regardless of where or when or against whom such claims, demands or other Liabilities are asserted or determined or whether asserted or determined prior to, on or after [signing or closing]."[32] This too is an unusual provision. In purchase agreements, "there is invariably an article dealing with indemnification of the purchaser by the seller or seller's stockholders. Never the other way around . . . ."[33] As another commentator noted, although "indemnification can inure to the benefit of a Seller," it is "generally considered in the context of a Buyer's right to collect from the Seller."[34] Indeed, even where those commentators allow that it is conceivable that a seller might be indemnified, they appear to be focused strictly on indemnification for breaches of representations and warranties, not the broad indemnification for all liability found here.[35]

The Purchase Agreement also contained an additional, material limitation on Chicago Bridge's liability related to Stone's construction projects. One condition precedent to closing—one of only three that was a condition to both Chicago Bridge's and Westinghouse's obligation to close—stated that neither party was

---

[32] *Id.* at A112 (§ 10.4); *id.* at A115 (§ 11.1) (defining Assumed Liabilities).
[33] JAMES C. FREUND, ANATOMY OF A MERGER 365 (1975).
[34] KLING & NUGENT, *supra* note 30, at § 15.01.
[35] *Id.*; *see also id.* at § 15.02[1][b] ("Except in transactions where the purchase price is paid completely or partially in securities where Buyer indemnification (and representations) tends to be coextensive with that granted by the Seller to the Buyer, it is less typical for the Buyer to indemnify the Seller with respect to breaches of its representations or other matters.").

obligated to close if liability releases Chicago Bridge anticipated receiving from the power plant owners were not "valid and binding and in full force and effect" as of the Closing Date.[36]

*iii.*

It is worth summarizing where things stood when Westinghouse signed the Purchase Agreement on October 27. Westinghouse had copies of Stone's financial statements that Chicago Bridge represented complied with GAAP. Westinghouse also had, in the form of Schedule 1.4(f), an indication that, at least based on those financials for the first half of 2015, Stone's net working capital would have been slightly below the Target and so Chicago Bridge could have been expected to make a payment to Westinghouse if they had closed the deal on those financials. But, Westinghouse also knew that the Purchase Agreement obligated Chicago Bridge to continue to operate Stone in the ordinary course of business,[37] which, given that its business was construction, would involve continuing to invest in the nuclear projects. Thus, Westinghouse would have expected that, as happened throughout the projects, Chicago Bridge's continued funding of Stone's work would result in an increase in net working capital. Furthermore, Westinghouse knew that the Purchase Agreement the parties were signing would rid Chicago Bridge at closing of current

---

[36] App. to Appellant's Opening Br. at A110 (Purchase Agreement § 8.3(c)).
[37] *Id*. at A89–90 (§ 5.3(a)).

17

and future liability for the spiraling costs associated with Stone's projects, and covering those liabilities would be the responsibility of Westinghouse and the projects' ultimate owners. In exchange, Chicago Bridge would give Stone to Westinghouse for a price set presumptively at zero.

*D.*

*i.*

After signing, Chicago Bridge continued Stone's construction of the two nuclear plants, spending around $1 billion on their construction between June 30 and closing alone.[38] Westinghouse and the ultimate plant owners didn't pay nearly that amount to Chicago Bridge,[39] so, as commonly occurs when a business does the thing that it is in business to do and doesn't get paid immediately, Stone's short-term assets like accounts receivable increased.

The multi-step True Up process began just before closing. First, at least three business days before closing, Chicago Bridge had to deliver a statement to Westinghouse of its good faith estimate of certain amounts (the "Closing Payment Statement"), including the Net Working Capital Amount. The Closing Payment Statement had to be "prepared and determined from the books and records of the Company and its Subsidiaries and in accordance with United States generally

---

[38] *Id*. at A40 (Verified Compl., dated July 21, 2016 ¶ 54).
[39] *Id*.

accepted accounting principles ("GAAP") *applied on a consistent basis throughout the periods indicated and with the Agreed Principles*."[40]   The Agreed Principles provided:

> Working Capital . . . will be determined in a manner *consistent with GAAP, consistently applied* by [Stone] in preparation of the financial statements of the Business, as in effect on the Closing Date.  To the extent not inconsistent with the foregoing, Working Capital . . . shall be based on *the past practices and accounting principles, methodologies and policies* applied by [Stone] and its subsidiaries and the Business (a) in the Ordinary Course of Business and (b) in the preparation of: (i) the balance sheet of the [Stone] and its Subsidiaries for the year ended December 31, 2014 (adjusted to reflect the Business); and (ii) the Sample Calculation set forth on Schedule 1.4(f).[41]

So, on December 28, 2015, three days before closing, Chicago Bridge presented Westinghouse with its Closing Payment Statement, which included an estimated Net Working Capital Amount of $1.6 billion, approximately $428 million more than the Target.  The increase was largely a result of the substantial construction costs Chicago Bridge incurred during the second half of 2015.  Thus, absent other changes, Westinghouse would have been on the hook for that $428 million in bills Westinghouse and the utilities hadn't paid to Stone, a contribution that was expected given the ongoing nature of the construction on the projects. Westinghouse received this Closing Payment Statement, which it concedes was identical in form to what the Purchase Agreement required in Section 1.4(f) and

---

[40] *Id.* at A68 (Purchase Agreement § 1.4(f)) (emphasis added).
[41] *Id*. at A164 (Sch. 11.1(a)) (emphasis added).

19

Schedule 1.4(f). And, with that Statement in hand, on December 31, 2015, Westinghouse chose to close.

*ii.*

In the second step of the True Up, Westinghouse had to deliver to Chicago Bridge no later than ninety days after closing its calculations of certain amounts (the "Closing Statement"), including the Net Working Capital Amount and its estimate of the Final Purchase Price, which, like the Closing Payment Statement, was to be "prepared and determined from the books and records of the Company and its Subsidiaries and in accordance with United States generally accepted accounting principles ('GAAP') *applied on a consistent basis throughout the periods indicated and with the Agreed Principles.*"[42] Westinghouse asked for an extension of the ninety-day deadline, which it received.

Then, on April 28, 2016, Westinghouse presented the Closing Statement to Chicago Bridge in which it calculated that the Net Working Capital Amount was negative $976.5 million, more than $2 billion less than the Target. Based on this calculation, and absent other changes, Chicago Bridge owed Westinghouse over $2 billion. As Westinghouse concedes, "the majority" of its claims do not arise from changes in Stone's business between signing on October 27 and closing December

---

[42] *Id*. at A68 (§ 1.4(f)).

31.[43] Similarly, Chicago Bridge admits that, of the roughly $2 billion at issue, about $70 million are issues that involve a change in fact or circumstance that arose between signing and closing and are properly before the Independent Auditor.[44]

The large discrepancy between Chicago Bridge's estimate and Westinghouse's calculation was mostly the result of three changes that Westinghouse made in its calculation. None of these large changes were based on events between signing and closing. First, Westinghouse recalculated the $1.16 billion "claim cost" asset on Stone's balance sheet. The "claim cost" asset represented "the costs incurred and paid for by [Stone] for items that would be presented for recovery from either the project owners or Westinghouse as a matter of contractual entitlement or as claims for overruns for which [Stone] was not responsible."[45] In other words, these represent some of the very cost overruns that triggered Chicago Bridge's desire to walk away from Stone and its projects.

Chicago Bridge had historically estimated 100% collectability of the "claim cost" asset, including in calculating the Target and example calculation found in Schedule 1.4(f) because they were based on the GAAP-warranted June 2015 financials. Westinghouse now asserted that historical approach violated GAAP.

---

[43] Oral Argument at 30:06, *Chicago Bridge & Iron v. Westinghouse Electric*, No. 573, 2016 (Del. May 3, 2017).
[44] *Id.* at 3:49.
[45] App. to Appellant's Opening Br. at A25–26 (Verified Compl., dated July 21, 2016 ¶ 29).

Instead, Westinghouse argued that the "claim cost" asset should be reduced by 30%—to reflect that 30% of these costs would likely not be recoverable—and also that Chicago Bridge should have recorded a reserve liability of hundreds of millions of dollars for related losses Stone would have taken as a result of design changes going forward. In essence, Westinghouse argued that it would not have honored all of its obligations under the consortium agreements and would have avoided liability for some of Stone's claims for recovery. Thus, Westinghouse's argument could be summarized as "although our initial deal was you get a release from the spiraling costs of these projects going forward and we get the bulk of the potential upside, now we want to stick you with close to $1 billion more of those costs that you thought you were getting rid of when you gave us Stone." These changes resulted in a $903.9 million decrease in the Net Working Capital Amount.[46]

Second, Westinghouse asserted that the projects would cost approximately $3.2 billion more to complete than Chicago Bridge had originally predicted and, therefore, that Chicago Bridge should have recorded an additional liability of $956.6 million, again based on Westinghouse's assertion that 30% of the additional costs would not be recoverable from Westinghouse or the project owners. Much like the first item, Chicago Bridge had accounted for these costs in a consistent way in the past and the increase represented the precise reason Chicago Bridge was willing to

---

[46] *Id*. at A43 (¶ 60) (citing Westinghouse's calculation).

hand Stone over for zero dollars in the first place. And, Westinghouse did not point to changes after signing that are driving the increased costs.

Third, Westinghouse asserted that Chicago Bridge omitted a margin fair value liability of $432 million from Stone's balance sheet that Chicago Bridge had recorded in connection with its acquisition of Stone in 2013.[47] The margin fair value liability is a non-cash account established by a purchaser to reflect a reduction of the net purchase price driven by the purchaser's assumption of an unfavorable contract.[48] This liability was included in Chicago Bridge's financial statements, but it had never been included in Stone's financial statements or the Target.[49]

*       *       *

The sum total of the logic of Westinghouse's claims is worth stating. Based on challenges to large items included in the financials that Chicago Bridge represented were GAAP compliant, which Westinghouse knew about before closing, and which it did not use as a basis not to close, Westinghouse now says that it should keep Stone, which it got for zero dollars, and be paid by Chicago Bridge over $2 billion for taking it!

---

[47] *Id*. at A16 (¶ 10).
[48] Opening Br. at 19.
[49] App. to Appellant's Opening Br. at A25–26 (Verified Compl., dated July 21, 2016 ¶ 67); *id*. at A167 (Purchase Agreement Sch. 1.4(f)).

*iii.*

In the True Up's third stage, Chicago Bridge had sixty days to review the Closing Statement and dispute elements of the Closing Statement in writing (the "Objections Statement"). If Chicago Bridge delivered an Objections Statement, Westinghouse and Chicago Bridge had to negotiate in good faith for thirty days to resolve its contents. Unsurprisingly, Chicago Bridge raised several objections to Westinghouse's calculations, which the parties attempted to resolve through negotiation.

When, as was the case, Chicago Bridge and Westinghouse could not reach an agreement by the end of this thirty-day period, either party was permitted to submit the dispute to the Independent Auditor, identified in the Purchase Agreement as KPMG. The Independent Auditor was to function "solely as an expert and not an arbitrator" and was not permitted to assign a value to any item greater than the highest value for the item claimed by Chicago Bridge or Westinghouse or less than the lowest value claimed for the item by Chicago Bridge or Westinghouse.[50] The Independent Auditor was limited in several other ways. The Independent Auditor was to base its conclusions solely on written submissions from Chicago Bridge and Westinghouse, had thirty days to make its conclusion, and that conclusion was to

---

[50] *Id*. at A66–67 (Purchase Agreement § 1.4(c)).

come in the form of "a brief written statement."[51]  Any determination made by the Independent Auditor was to be "final, conclusive, binding, non-appealable and incontestable by the parties."[52]

<em>iv.</em>

Chicago Bridge filed this action against Westinghouse and alleged that Westinghouse's calculation of the closing date adjustment breached the express terms of the Purchase Agreement and the implied covenant of good faith and fair dealing.  At that time, Westinghouse had not invoked the Independent Auditor, but, it seemed certain Westinghouse intended to do so.[53]  Chicago Bridge, therefore, sought an order declaring that Westinghouse's claims over the Net Working Capital Amount were actually claims for breaches of the representations, which had been extinguished under the Liability Bar, and further declaring that Westinghouse could not circumvent the Liability Bar by submitting its claims to the Independent Auditor under the True Up.  Westinghouse moved for judgment on the pleadings, arguing that the True Up establishes a mandatory process for resolving the parties' disagreements.  The Court of Chancery granted Westinghouse's motion, finding that

---

[51] *Id*. at A67 (§ 1.4(c)).

[52] *Id.*

[53] As part of the Stipulation and Scheduling Order in the Court of Chancery, Chicago Bridge and Westinghouse agreed not to submit any claims to the Independent Auditor until the case was resolved, but they would identify and engage the Independent Auditor.  *Id*. at A170 (Granted Stipulation and Scheduling Order Concerning Case Schedule, dated August 4, 2016).  And, after the Court of Chancery's decision, Chicago Bridge and Westinghouse have pressed their claims before the Independent Auditor.  Appellees' Answering Br. at 3.

the unambiguous language of the Purchase Agreement required the Closing Payment Statement and Closing Statement to be GAAP compliant, and that the Independent Auditor's authority extends to all disputes related to the Objections Statement and Closing Statement. This appeal followed.

## II.

This Court reviews *de novo* the Court of Chancery's grant of a motion for judgment on the pleadings.[54] A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[55] "[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[56]

### A.

Chicago Bridge argues that the bulk of Westinghouse's changes to the Net Working Capital Amount fall outside the scope of matters that the Independent Auditor may resolve under the True Up because they implicate Stone's historical accounting practices. According to Chicago Bridge, the vast majority of Westinghouse's claims—or around $1.93 billion[57]—really constitute alleged

---

[54] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1204 (Del. 1993).
[55] *Id.* at 1205.
[56] *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).
[57] *See supra* note 44.

26

breaches of the Purchase Agreement's representations. The calculations of the Net Working Capital Amount included in Chicago Bridge's Closing Statement were based on Stone's earlier financial statements, which Chicago Bridge represented were GAAP compliant.[58] And, under the Purchase Agreement's Liability Bar, Westinghouse gave up its post-closing rights to challenge the representations and warranties. Thus, Chicago Bridge argues that Westinghouse is trying to get around the Liability Bar through the True Up. Unlike Westinghouse, Chicago Bridge conceives of the True Up as a limited procedure for Chicago Bridge and Westinghouse to account for changes in Stone's business during the period from signing to closing and maintain the benefit of the deal they struck.

In contrast, Westinghouse argues that the True Up is a process for resolving any disagreement over the calculation of the final purchase price, not limited to the calculation of the Net Working Capital Amount, which the parties are required to follow. And, therefore, the fact that Westinghouse's objections to Chicago Bridge's calculation of the Net Working Capital Amount could have also been claims for a breach of Chicago Bridge's GAAP representation because they relate to Chicago Bridge's historical accounting practices for Stone is irrelevant. Indeed, in its answering brief, Westinghouse argues:

> In other words, for pre-closing purposes, [Westinghouse] agreed to accept the Article II Financials with their GAAP variations without

---

[58] App. to Appellant's Opening Br. at A71 (Purchase Agreement § 2.6(a)).

recourse, but only because for purposes of setting a price, [Westinghouse] bargained for a more objective standard. *Under the Agreement, then, [Westinghouse] reasonably could proceed to closing regardless of whether [Chicago Bridge's] representations about its financial state were fully GAAP-compliant, precisely because it had assurances that the price ultimately fixed would be rooted not in those representations, but in different, special-purpose, GAAP-compliant calculations.*[59]

Put bluntly, Westinghouse alleges that it gave up nothing in the Liability Bar because, through the True Up, it could seek monetary payments by alleging that Chicago Bridge's historical accounting treatment wasn't GAAP compliant.

*B.*

As is often true in cases involving disputes over complex agreements, Chicago Bridge and Westinghouse assert that each of their views of the True Up are supported by the unambiguous terms of the Purchase Agreement.[60] We agree with both Chicago Bridge and Westinghouse that the Purchase Agreement is unambiguous when read in full and situated in the commercial context between the parties.[61] When

---

[59] Answering Br. at 29 (emphasis added).

[60] *Cf. Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."); *Nw. Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) ("Although the parties disagree as to the proper interpretation of the contract, their disagreement does not create an ambiguity.").

[61] "[Delaware] courts interpreting a contract 'will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'" *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)); *see also Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."); *Eugene*

28

we do so, we conclude that Chicago Bridge's reading of the contract is the proper one and that Westinghouse's interpretation of the True Up, which the Court of Chancery adopted, cannot be reconciled with Purchase Agreement when interpreted consistently in its entirety.[62]

## C.

The basic business relationship between parties must be understood to give sensible life to any contract. As explained earlier, Chicago Bridge and Westinghouse had a complicated commercial relationship building nuclear power plants, which led to disputes. To resolve these disputes, Westinghouse and Chicago Bridge agreed to enter into the Purchase Agreement through which Westinghouse would acquire Stone. The Purchase Agreement set a purchase price of zero dollars, which is then adjusted through the True Up, and, unusually for a transaction selling

---

*A. Delle Donne & Son, L.P. v. Applied Card Sys., Inc.*, 821 A.2d 885, 887 (Del. 2003) ("In construing a contract, the document must be considered as a whole . . . ."); *Nw. Nat. Ins. Co.*, 672 A.2d at 43; RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."); 11 WILLISTON ON CONTRACTS § 32:5 (4th ed.) ("[A] contract will be read as a whole and every part will be read with reference to the whole.").

[62] *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.").

a subsidiary, contained the Liability Bar, as well as a broad indemnification for the seller, Chicago Bridge.

Crucially, in exchange for receiving zero upfront consideration, Chicago Bridge would be released from all liability related to the projects. This reflected the essence of the deal: Chicago Bridge would deliver Stone to Westinghouse for zero dollars in up front consideration and, in return, would be released from any further liabilities connected with the projects. Not only would Westinghouse indemnify Chicago Bridge against future liabilities, but closing was contingent on Chicago Bridge receiving releases from the utility companies that would operate the plants when they were completed. The True Up works in this context to ensure Chicago Bridge was appropriately compensated for the work it expected to continue to do and Westinghouse was protected if Chicago Bridge suddenly stopped work or if Westinghouse and the power utilities started paying their bills owed to Stone unexpectedly quickly, such that Stone's accounts receivable went down more than expected and thus net working capital fell. Thus, the crux of this deal was that Chicago Bridge was done with the nuclear projects. It would get no profit for selling Stone—as of closing—but the Liability Bar, indemnity, and releases meant Chicago Bridge would at least be rid of liability for the still-spiraling costs of the projects, a privilege that was valuable in that context. Now, Westinghouse says Chicago Bridge

should pay it an extra \$2 billion for that privilege.[63]  As the key provisions of the Purchase Agreement show and the business context they highlight demonstrates, Westinghouse's view that the Purchase Agreement gave it a free license to re-trade the core common basis of the exchange is beyond strained; it involves a rewriting of the contract embodying that exchange.

*D.*

*i.*

The True Up has an important role to play, but that role is limited and informed by its function in the overall Purchase Agreement.  Generally speaking, purchase price adjustments in merger agreements account for changes in a target's business between the signing and closing of the merger.[64]  This is especially so when the purchase price is based on the target's value at closing.[65]  As experienced commentators have observed, when a purchase price involves a fixed amount plus or minus net working capital changes, there are two main interpretations of the variable amount.  The most common is that "the business being sold is run for the seller's benefit (for better or worse) from the date on which working capital was that fixed dollar amount until closing.  If the business sells a lot of widgets during that

---

[63] *See OSI Systems, Inc. v. Instrumentarium Corp*, 892 A.2d 1086, 1093–94 (Del. Ch. 2006).

[64] ABA, ABA MODEL STOCK PURCHASE AGREEMENT WITH COMMENTARY 64 (2d ed. 2010).

[65] KLING & NUGENT, *supra* note 30, at § 17.01[2] (2016).  "In this situation, the parties have agreed that the price the buyer should pay is related to the target's financial position on the closing date as compared to its financial position as of a reference date."  *Id.*

31

period, and working capital increases as a result, the seller [gets] paid more."[66]  This illustrates the fundamental nature of net working capital adjustments as existing to account for changes in a target business from signing until closing.  Buyers want protection against value depletion before they take over the business, and, at the same time, sellers want to ensure that they will be compensated for effectively running the business.[67]  Thus, purchase price adjustments account for the normal variation in business from signing until closing to assure the buyer and seller that the purchase price accurately reflects the target's financial condition at the time of closing.[68]

<em>ii.</em>

The True Up provision of the Purchase Agreement is consistent with the general role net working capital adjustments play.  The plain terms of the definition of Net Working Capital, read in conjunction with the rest of Purchase Agreement, require the use of Stone's past accounting practices, rather than a new assessment of

---

[66] *Id.* at § 17.02.  Alternatively, the "generally less relevant interpretation is that the Buyer is guaranteed an amount of working capital equal to such fixed amount."  *Id.*

[67] *Id.* ("The seller and its personnel are viewed as 'lame duck' management and the buyer will be concerned that the business will languish under their direction."); ERNST & YOUNG, SHARE PURCHASE AGREEMENTS: PURCHASE PRICE MECHANISMS AND CURRENT TRENDS IN PRACTICE (2d ed. 2012) ("Purchase price adjustments aim to protect the buyer against value erosion and value leakage at the target company until the closing date.  At the same time, they should reward the seller for managing the business well between the reference date and closing."); Mark Thierfelder, et al., *Working Capital Adjustment: At the Crossroads of Law and Accounting*, N.Y.L.J. Oct. 26, 2015 ("Buyers typically want to protect against the depletion of working capital after signing and ensure that an acquired business has an appropriate amount of working capital.").

[68] ABA, *supra* note 64, 64–65.

those historical practices' compliance with GAAP. The Purchase Agreement states that the Closing Payment Statement and Closing Statement, of which the Net Working Capital estimates and Westinghouse's disputed items are a part, must be "prepared and determined from the books and records of [Stone] and its Subsidiaries and in accordance with United States generally accepted accounting principles ('GAAP') *applied on a consistent basis throughout the periods indicated* and with the Agreed Principles."[69] And, the Agreed Principles require that Working Capital calculations be "determined in a manner consistent with GAAP, *consistently applied by Seller Parent in preparation of the financial statements* of the Business, as in effect on the Closing Date" and "*based on the past practices and accounting principles, methodologies and policies*" used by Stone.[70] Thus, the Closing Payment Statement and Closing Statement have to comply with two conditions: i) they must be prepared from Stone's books and records; and ii) they must use the same accounting approach as had been used in the past.

The phrases "applied on a consistent basis throughout the periods indicated" and "based on the past practices and accounting principles, methodologies and policies" both require consistent accounting treatment. They recognize that GAAP allows for a variety of treatments and different accountants may come to differing

---

[69] App. to Appellant's Opening Br. at A68 (Purchase Agreement § 1.4(f)) (emphasis added).
[70] *Id*. at A164 (Sch. 11.1(a)) (emphasis added).

views on what constitutes acceptable GAAP treatment, but for the purpose of these calculations, both Westinghouse and Chicago Bridge must hold the accounting approach constant. Thus, the True Up and the Agreed Principles work together to establish a requirement of consistency. The Agreed Principles also do something else: they set the approach to GAAP as that already used by Chicago Bridge "in preparation of the financial statements of the Business."[71] Thus, when read together, these parts of the Purchase Agreement require Westinghouse and Chicago Bridge to continue using the accounting approach Chicago Bridge had been using in the normal course of business before the transaction for the calculations up to and through closing. This makes sense when considering the whole point of these statements. They are not to aid Westinghouse's investigation of the business or to otherwise provide a historical picture of Stone's operations. Rather, they account for changes in Stone's business from the time when the Purchase Agreement was agreed on until closing. Thus, keeping all other variables constant in terms of accounting is crucial.

Paying close attention to how the representations and warranties fit together with the True Up reinforces this point. Chicago Bridge represented that it provided "the financial statements of [Stone] . . . (collectively, the 'Financial Statements')" and that those Financial Statements had "been prepared in accordance with

---

[71] *Id.*

GAAP."[72] Working Capital is defined as being determined on the basis of GAAP "consistently applied by Seller Parent in preparation of the financial statements of [Stone]."[73] Thus, it would be unreasonable to interpret the definition of Working Capital as allowing for a different accounting approach from that used for the Financial Statements.[74] Instead, the consistency language of the Working Capital definition emphasizes that there is one approach to GAAP and one set of statements that are appropriate for use throughout the transaction. This is, of course, common sense, when keeping the broader context in mind: it would be awfully difficult for the True Up to fulfill one of its main roles, i.e., account for changes in Stone's business between signing and closing, if one accounting approach was used to complete the Financial Statements for signing and another one was used to complete the True Up calculations.

This interpretation of the True Up gives the language of Section 1.4 an important role to play in the transaction, but not as wide-ranging as Westinghouse's preferred interpretation. As is traditionally the case with provisions like this one, the True Up's effect is that Chicago Bridge could continue operating Stone as though

---

[72] *Id*. at A71 (§ 2.6(a)).

[73] *Id*. at A164 (Sch. 11.1(a)).

[74] *See OSI*, 892 A.2d at 1093 (rejecting a similar argument that a reference statement of working capital was not specifically represented to be GAAP compliant and so the figures of that statement could be reassessed for GAAP compliance outside of a representation and warranty breach adjudication, because those reference statements were based on the financial statements that were represented to be GAAP compliant).

35

it was still its own business, but without worrying that pursuing normal construction operations would benefit Westinghouse to its own detriment. Westinghouse was also protected to the extent Chicago Bridge or Stone tried to suddenly shift course in how it chose to treat Stone from an accounting perspective, even though Chicago Bridge's representations, and therefore liability under an indemnity or breach of contract theory, about Stone's GAAP compliance lapsed at closing. Or, if Chicago Bridge didn't follow through with the construction program or if Westinghouse and the utilities paid a bunch of their bills, Westinghouse wouldn't end up worse off than it was at signing thanks to the True Up. Thus, this interpretation of the True Up maintains the underlying economics of the parties' bargain.

*iii.*

Additionally, to understand the role the True Up plays in the Purchase Agreement, it is important to recognize the limited role of the adjudicator, here an auditor (called the Independent Auditor in the Purchase Agreement), that Chicago Bridge and Westinghouse selected. The Independent Auditor does not have a mandate to address any dispute that might come from the Purchase Agreement.[75] Instead, Chicago Bridge and Westinghouse identified a set of specific disputes that

---

[75] Indeed, even in a situation where the Court of Chancery addressed an adjudicator in a somewhat similar role to the Independent Auditor, but with arguably broader powers, it observed that issues related to potential misrepresentations made by a seller "are not generally viewed as the kind of disputes that would be resolved by the person charged with 'truing up' the books." *Matria Healthcare, Inc. v. Coral SR LLC*, 2007 WL 763303, at *6 (Del. Ch. Mar. 1, 2007).

the Independent Auditor could resolve. Chicago Bridge could call on the Independent Auditor to determine if Westinghouse had provided adequate access to its books and records to assist Chicago Bridge in assessing Westinghouse's calculation of the Closing Statement.[76] If Westinghouse wanted to change the purchase price allocation and Chicago Bridge disputed the change, the Independent Auditor could be called on to resolve that dispute.[77] Similarly, if Chicago Bridge and Westinghouse disagreed about the calculation of earnout amounts, the Independent Auditor could resolve those disputes.[78] And, of course, the Independent Auditor was charged with resolving disputes between Chicago Bridge and Westinghouse over the Closing Payment Statement and Closing Statement.[79]

But, the Purchase Agreement further limited the scope of the Independent Auditor's review even in the limited situations where it was empowered to review anything. For one thing, the Purchase Agreement states in multiple places that the auditor was acting "as an expert and not as an arbitrator."[80] That language by itself has been read to narrow the scope of the expert's domain.[81] The Independent

---

[76] App. to Appellant's Opening Br. at A66 (Purchase Agreement § 1.4(b)).
[77] *Id*. at A69 (§ 1.6).
[78] *Id*. at A157–58 (Sch. 1.3(d)).
[79] *Id*. at A66–67 (§ 1.4(c)).
[80] *Id*. at A66 (§ 1.4(b)); A157–58 (Sch. 1.3(d)).
[81] *See, e.g.*, *AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc*., 2009 WL 1707910, at *2 (Del. Ch. June 16, 2009). New York law has also recognized the distinction between arbitrators and experts; one report on the state of New York's law on the topic notes "[w]here the parties have selected an expert to decide factual issues within the scope of that decision maker's expertise, the parties have chosen expert determination as the dispute resolution mechanism, not arbitration,"

Auditor was to base its conclusions solely on written submissions from Chicago Bridge and Westinghouse, had thirty days to make its conclusion, and that conclusion was to come in the form of "a brief written statement."[82] Thus, the Independent Auditor did not have a wide-ranging brief to adjudicate all disputes between Chicago Bridge and Westinghouse under the Purchase Agreement, but rather one confined to a discrete set of narrow disputes.[83] Notably, those duties never

---

Compendium of Selected Authorities Cited in Appellant's Opening Br. ex 5 (Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements 24 (June 2013)), and that incorrectly treating an expert as an arbitrator can lead to experts "being granted broader and deeper authority than that reasonably expected by the parties," *id.* at 49.

[82] App. to Appellant's Opening Br. at A67 (Purchase Agreement § 1.4(c)).

[83] Indeed, the Independent Auditor's role as to the True Up is far different from broad arbitration provisions that empower an arbitrator to decide any disputes arising under or related in any way to a claim under a contract. *E.g.*, *Riley v. Brocade Commc'ns Sys., Inc.*, 2014 WL 1813285, at *2 (Del. Ch. May 6, 2014) ("[T]he parties agree that any and all claims, disputes or controversies of any nature whatsoever arising out of, or relating to, this Agreement, the COC [Change of Control] Plan and/or the Participation Agreement, or their interpretation, enforcement, breach, performance or execution, Employee's employment with the Company, or the termination of such employment, shall be resolved, to the fullest extent permitted by law by final, binding and confidential arbitration" (quoting agreement at issue in the case)). The Purchase Agreement's specific delineation of areas the Independent Auditor may review stands in sharp contrast to broad arbitration provisions. Even where the Purchase Agreement's language seems broad, stating that Westinghouse and Chicago Bridge may submit "any and all matters that remain in dispute with respect to the Objections Statement, the Closing Statement and the calculations set forth therein," the remainder of the sentence "with respect to the Objections Statement, the Closing Statement and the calculations set forth therein" qualifies the universe of disputes to those embodied in those statements and calculations and thus only disputes properly part of the True Up. App. to Appellant's Opening Br. at A67 (Purchase Agreement § 1.4(c)).

Such broad arbitration provisions can even be used to empower the arbitrator to determine disputes like this about arbitrability itself. *E.g.*, *Pryor v. IAC/InterActiveCorp*, 2012 WL 2046827, at *5–*6 (Del. Ch. June 7, 2012) (applying a stockholder's agreement that stated "[a]ny controversy concerning whether a matter is an arbitrable matter . . . shall be determined by the [a]rbitrator," and concluding that the determination of what claims could be heard by the arbitrator was the arbitrator's decision to make (quoting the stockholder's agreement at issue in the case)); *see also James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006) (determining that arbitrators are empowered to decide arbitrability in circumstance where the "arbitration clause

38

included assessing if Chicago Bridge breached the representations and warranties it offered in the Purchase Agreement.[84]

*iv.*

That the Purchase Agreement's plain meaning does not allow claims that could have been brought as breaches of representations and warranties to be brought as part of the True Up is also apparent because to allow such claims would largely render the Liability Bar meaningless. That section cuts off both parties' liability for breaches of representations and warranties at closing. The majority of the issues Westinghouse disputes with respect to the Net Working Capital Amount reflect its position that Chicago Bridge's historical accounting treatment of Stone was not GAAP compliant. Westinghouse argues that under the Purchase Agreement, it could accept non-GAAP compliant financial statements pre-closing and wait until the post-closing adjustment process to dispute Chicago Bridge's historical accounting

---

generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability"). By contrast, the agreement to arbitrate disputes from the True Up embodied in the Purchase Agreement addresses a narrow set of disputes, disclaims that the expert is an arbitrator, and thus the parties both agreed that any dispute over what claims may be asserted in the True Up proceeding and what claims are barred by the Liability Bar must be addressed by a court.

[84] *See OSI*, 892 A.2d at 1091 ("[The relevant purchase agreement's provisions] appears on its face to simply contemplate the use of an Independent Accounting Firm if there are differences of opinion about the amount of Modified Working Capital . . . . OSI's current position involves the Independent Accounting Firm in an entirely different and more ambitious role: that of determining that the Transaction Accounting Principles used in the Reference Statement were not compliant with U.S. GAAP.").

methodology, despite the Liability Bar's elimination of liability. Indeed, Westinghouse's Answering Brief states:

> In other words, for pre-closing purposes, [Westinghouse] agreed to accept the Article II Financials with their GAAP variations without recourse, but only because for purposes of setting a price, [Westinghouse] bargained for a more objective standard. *Under the Agreement, then, [Westinghouse] reasonably could proceed to closing regardless of whether [Chicago Bridge's] representations about its financial state were fully GAAP-compliant, precisely because it had assurances that the price ultimately fixed would be rooted not in those representations, but in different, special-purpose, GAAP-compliant calculations.*[85]

But, Westinghouse's view that such changes can be addressed through the True Up renders the Liability Bar meaningless and eviscerates the basic bargain between these two sophisticated parties.[86] The financial statement representation is the most important representation in a typical purchase agreement.[87] So, Westinghouse's argument would mean that the Liability Bar doesn't mean what plain English would suggest it means for the most important item that section ostensibly encompasses, because, under Westinghouse's interpretation, the end of liability on the financial statements representation has no effect as to any item conceivably subject to change as part of the True Up because any qualm

---

[85] Answering Br. at 29 (emphasis added).

[86] *See OSI*, 892 A.2d at 1093 (observing that accepting a seller's argument that allowing certain claims to be heard in the purchase price adjustment adjudication would "undermine the limitations on liability and the core dispute resolution mechanism" agreed to by the parties).

[87] FREUND, *supra* note 33, at 254 (observing that if a purchaser could have only one representation, it would be "the financial statements, of course").

Westinghouse had about Stone's historic accounting treatment could be brought before the Independent Auditor. As the Court of Chancery has observed, "where the contract expressly provides that the representations and warranties terminate upon closing . . . the parties have made clear their intent that they can provide no basis for a post-closing suit seeking a remedy for an alleged misrepresentation. That is, when the representations and warranties terminate, so does any right to sue on them."[88] To accept Westinghouse's interpretation of the True Up would require reading into this unambiguous agreement an unwritten, material exception to the Liability Bar, which this Court declines to do. Under the plain terms of the Purchase Agreement, if Westinghouse disagreed with the accounting methodology that Chicago Bridge historically used, it could refuse to close or sue for damages.[89] After closing, Westinghouse could only use the True Up to resolve disputes arising from changes in facts or circumstances of Stone's business between signing and closing.

Westinghouse also urges that when Section 10.3 explicitly preserves the True Up after closing, that can only mean Westinghouse is allowed to bring any claims it chooses post-closing despite the Liability Bar in Section 10.1. Section 10.3 provides that the Liability Bar "shall not . . . operate to interfere with or impede the operation

---

[88] *GRT, Inc. v. Marathon GTF Technology, Ltd.*, 2011 WL 2682898, at \*13 (Del. Ch. July 11, 2011).
[89] App. to Appellant's Opening Br. at A108 (Purchase Agreement § 8.1(a)).

of the provisions" addressing the True Up.[90] But, accepting that Westinghouse cannot close and then object, for the first time, to Chicago Bridge's consistent accounting treatment in the True Up is consistent with the language of Section 10.3. Given the Liability Bar's broad language cutting off liability for money damages after closing, Section 10.3 simply makes clear that the True Up has teeth for addressing changes in Stone's business between signing and closing and that those changes very well might result in money changing hands between Chicago Bridge and Westinghouse, either for expected reasons, such as Chicago Bridge's obligation to inject substantial capital into Stone, or less innocuous ones, such as Chicago Bridge or Westinghouse fiddling with the accounting used in the True Up's statements to swing the balance in that party's favor. Under this reading, Section 10.3 plays its meaningful and expected, but confined, role in the Purchase Agreement. By contrast, Westinghouse's strained argument that Section 10.3 is a broad license for Westinghouse to resuscitate claims covered by the Liability Bar in the True Up process is not reasonably supported by its language or its role within the overall context of the Purchase Agreement.

---

[90] *Id*. at A112 (§ 10.3(a)).

*v.*

Although Westinghouse argues[91] that the True Up was structured after the analogous provision at issue in *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P*,[92] the True Up differs in a material fashion. Indeed, the True Up here is more similar to that at issue in *OSI Systems, Inc. v. Instrumentarium Corp.*[93] and in a New York case, *Westmoreland Coal Co. v. Entech, Inc*.[94] In *OSI*, the Court of Chancery addressed a merger agreement containing one form of dispute resolution for disputes about the amount of working capital, without a cap on the amount of the dispute, and another form of dispute resolution for claims for breaches of representations and warranties, with a capped potential liability amount.[95] There, the initial exchange of estimates was essentially the same as what was required here: the seller created one before closing and the buyer did the same after closing. But, the buyer's calculation had to be "prepared in accordance with the Transaction Accounting Principles applied consistently with their application in connection with the preparation of the Reference Statement of Working Capital and the Statement of

---

[91] Oral Argument at 34:25, *Chicago Bridge & Iron v. Westinghouse Electric*, No. 573, 2016 (Del. May 3, 2017) ("[T]he architecture of what the parties did, exactly as they did in *Alliant* . . . ."); *id.* at 35:27 ("[W]e tracked [10.3] word for word from the *Alliant* agreement . . . ."); *see also* Appellees' Answering Br. at 4 (calling *Alliant* "remarkably analogous").

[92] 2015 WL 1897659 (Del. Ch. Apr. 24, 2015).

[93] 892 A.2d 1086 (Del. Ch. 2006).

[94] 794 N.E.2d 667 (N.Y. 2003).

[95] 892 A.2d at 1094.

Estimated Closing Modified Working Capital . . . ."[96] The term "Transaction Accounting Principles" meant "U.S. GAAP; *provided*, *however*, that: (i) with respect to any matter as to which there is more than one principle of U.S. GAAP, Transaction Accounting Principles means the principles of U.S. GAAP applied in the preparation of the Financial Statements . . . ."[97]

In *OSI*, the buyer's statement altered many of the accounting methods that the seller used in preparing the Reference Statement and Statement of Estimated Closing Modified Working Capital because the buyer alleged that those statements did not comply with GAAP. As a result, the buyer's calculation differed substantially from the seller's. The parties disputed whether the question of GAAP compliance should be resolved by an independent auditor under the purchase price adjustment provision, or if it needed to be resolved by a court under the agreement's indemnification provision.

*OSI*'s merger agreement required the working capital adjustments to be prepared "in accordance with the Transaction Accounting Principles applied consistently with their application in connection with the preparation of the Reference Statement of Working Capital and the Statement of Estimated Closing Modified Working Capital."[98] The Transaction Accounting Principles definition

---

[96] *Id*. at 1091.
[97] *Id.*
[98] *Id*.

44

included a requirement that they comply with GAAP, but as in this case, the party seeking the dramatic change as part of the working capital adjustment conceded that its grievances were not the result of changes between signing and closing, but rather existed before signing.[99] Thus, in *OSI*, like this case, there were historic financials that carried with them an approach to GAAP and a representation that the approach complied with GAAP. The language for the working capital adjustment similarly did not establish a separate GAAP compliance test, but instead a consistency test: the adjustment was to be "in accordance with the Transaction Accounting Principles *applied consistently with their application in connection* with the preparation of the [statements based on historical financials]."[100]

The seller's financial statements as of signing were also subject to a representation that they complied with GAAP and so the Court of Chancery concluded that the assertion that the Reference Statement of Working Capital did not comply with GAAP necessarily asserted a claim for a breach of that representation.[101] Like the True Up provisions here, "[t]he process set forth in [the OSI purchase agreement] was not intended to be used to resolve [contentions that the seller's historical accounting was materially inaccurate], it was designed to handle disputes about the extent of change in [target's] Modified Working Capital

---

[99] *Id.*
[100] *Id.*
[101] *Id.* at 1092.

between . . . the 'as of' date of the Reference Statement[] and . . . the Closing Date[] when measured under the same accounting principles used in preparing the Reference Statement."[102] Because the Court of Chancery read the purchase agreement to bar the buyer from "bypass[ing] the contractual Indemnification process, [and] ignor[ing] the contractual requirement to prepare its Initial Modified Working Capital Statement using accounting principles consistent with those used in the Reference Statement,"[103] and found that "the buyer's claims rest fundamentally on its assertion that the seller premised its financial statements and estimates of working capital on accounting judgments that violated generally accepted accounting principles," it determined that those claims involved claims for breaches of representations and warranties and could only be properly presented in the contractual indemnification process.[104]

New York State's highest court confronted a similar dispute in *Westmoreland* where the merger agreement required comparable closing date financial statements to be prepared "in accordance with GAAP applied on a consistent basis with past practices."[105] *Westmoreland* treated that language as establishing a test for consistency. Indeed, *Westmoreland* observed that "[w]hat is most important is that,

---

[102] *Id*. at 1095.
[103] Id.
[104] *Id*. at 1087.
[105] 794 N.E.2d at 670.

when preparing financial statements intended to be used for comparative purposes, the methodology be consistent applied . . . . [The Agreement's] emphasis on consistent treatment can only reflect a purpose to flag changes in value between . . . the date of acquisition pricing[] and the closing date."[106] *Westmoreland* determined that the buyer's attacks on GAAP compliance implicated the initial financial statements, and such claims constituted only a breach of the representation that those initial statements were GAAP compliant.[107] Those claims could "only be pursued in a court of law, with its attendant protections of discovery, rules of evidence, burdens of proof, and full appellate review."[108]

In contrast, in *Alliant* the definition of Net Working Capital was that it was a relevant set of assets less liabilities on a consolidated basis "*and* calculated in accordance with GAAP *and* otherwise in a manner consistent with the practices and methodologies used in the preparation of the [benchmark financial statements] . . . ."[109] The Chancellor found that the use of two separate "and"s created two separate tests.[110] The first test was if the calculation complied with GAAP. The second test was if the calculations were "otherwise" consistent with how the seller had prepared its financial statements. That is rather different from the

---

[106] *Id*. at 671.
[107] *Id*. at 671–72.
[108] *Id*.
[109] 2015 WL 1897659, at *7 (emphasis added).
[110] *Id*. at *8.

language present in *OSI*, *Westmoreland*, and here where the Closing Payment Statement and Closing Statement are simply required to use the same approach to GAAP as Chicago Bridge and Stone had employed historically; the Purchase Agreement's plain terms do not establish two separate tests.

## III.

For the reasons described, any argument by Westinghouse that the Closing Date Purchase Price should be adjusted due to assertions that Chicago Bridge's historical financial statements and accounting practices did not comply with GAAP may not be heard in a proceeding before the Independent Auditor. The Court of Chancery should enjoin Westinghouse from submitting claims to the Independent Auditor or continuing to pursue already-submitted claims based on arguments that also would have constituted arguments that Chicago Bridge breached the Purchase Agreement's representations and warranties. This leaves Westinghouse free to make any argument to the Independent Auditor that addresses a change in facts or circumstances that occurred between signing and closing relevant to the Closing Date Purchase Price. Thus, the judgment of the Court of Chancery dated December 5, 2016 is reversed. We remand this matter to the Court of Chancery and direct it to grant Chicago Bridge's requested declaratory relief.