# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NORTHERN DATA AG, a foreign corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0650-LWW |
| RIOT PLATFORMS, INC., a Nevada corporation, and WHINSTONE US, INC., a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: February 17, 2025
Date Decided: June 2, 2025

John A. Sensing, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Joshua B. Simmons, Frank Scaduto & Michael Showalter, WILEY REIN LLP, Washington, D.C.; *Counsel for Plaintiff Northern Data AG*

A. Thompson Bayliss, April M. Ferraro & G. Mason Thomson, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Robert S. Velevis, Mason Parham & Barret V. Armbruster, SIDLEY AUSTIN LLP, Dallas, Texas; *Counsel for Defendants Riot Platforms, Inc. and Whinstone US, Inc.*

**WILL, Vice Chancellor**

In 2021, a Bitcoin mining company bought a data center company for stock and cash. The cash consideration was subject to a post-closing adjustment process. The parties agreed that any purchase price adjustment dispute would be settled by an accounting expert.

After closing, the parties disagreed on the final price and submitted several issues to the accounting expert—four of which are raised here. The accounting expert resolved all four issues in the buyer's favor. Now, the seller has sued to vacate the accounting expert's determination.

The seller's arguments fall into two sets. On two of the four issues, it asserts that the accounting expert defied his contractual mandate by adhering to generally accepted accounting principles (GAAP) to the exclusion of the seller's historical accounting practices. On the other two issues, the seller insists that the matters were indemnity claims that fell outside the accounting expert's authority.

The parties have cross-moved for summary judgment, with mixed results. The buyer prevails on the first set of issues because GAAP took precedence over compliance with historical accounting practices. The seller prevails on the second set of issues, which are legal representation and warranty matters the accounting expert was not permitted to address.

## I. FACTUAL BACKGROUND

The following description is drawn from the undisputed facts in the pleadings and documentary exhibits the parties submitted.[1]

### A. Riot's Diligence of Whinstone

Northern Data AG is a German stock corporation that develops and operates computing infrastructure.[2] Before May 2021, it owned Whinstone US, Inc.—a Delaware corporation that builds and runs data centers.[3] Whinstone had three primary customers.[4] Two—SBI Crypto Co., Ltd., and Rhodium JV LLC—are relevant to this dispute.[5]

---

[1] Citations to "Pl.'s Ex. __" refer to exhibits to the Transmittal Affidavit of John A. Sensing in Support of Plaintiff Northern Data AG's Opening Brief in Support of its Motion for Summary Judgment (Exs. 1-35) (Dkts. 48 & 50) or the Transmittal Affidavit of John A. Sensing in Support of Plaintiff Northern Data AG's Answering Brief in Opposition to Defendants' Motion for Summary Judgment (Exs. 36-38) (Dkt. 59). Citations to "Defs.' Ex. __" refer to exhibits to the Transmittal Affidavit of April M. Ferraro, Esq. in Support of Riot Platforms, Inc. and Whinstone U.S., Inc.'s Opening Brief in Support of Their Motion for Summary Judgment (Exs. 1-32) (Dkt. 54) or the Transmittal Affidavit of April M. Ferraro, Esq. in Support of Riot Platforms, Inc. and Whinstone US, Inc.'s Response Brief in Support of Their Motion for Summary Judgment (Exs. 33-38) (Dkt. 61). Pincites are to internal pagination, except documents lacking internal pagination are cited by the last digits of Bates stamps ('---). Deposition transcripts are cited as "[Last Name] Dep."

[2] Verified Compl. of N. Data AG to Vacate Acct. Expert Determinations (Dkt. 1) ("Compl.") ¶ 8; Riot Platforms, Inc. and Whinstone US, Inc.'s Answer and Affirmative Defenses (Dkt. 33) ("Answer").

[3] Compl. ¶¶ 1, 9; Answer ¶¶ 1, 9; *see* Pl.'s Ex. 15 (Ernst & Young diligence presentation) '605.

[4] *See* Pl.'s Ex. 15 at '605.

[5] The third customer—GMO Game Center—is relevant to a prior lawsuit in this court. *See infra* Section I.D.

2

SBI and Rhodium entered into hosting agreements with Whinstone in 2019 and 2020, respectively.[6] Under a hosting agreement, Whinstone provides "access to electricity . . . , provision of cabling, escorted access and security, [and] cabling services," and "bills the[] customer based on usage multiplied by kilowatt per hour."[7]

In early 2021, Riot Platforms, Inc.—a Nevada corporation involved in Bitcoin mining—began to explore purchasing Whinstone from Northern Data.[8] Riot undertook financial diligence led by its advisor, Ernst & Young ("EY").[9] With the help of its accountants at Mazars USA LLP, Whinstone gave EY information including Whinstone's accounting policies and balance sheet items including cash, working capital, fixed assets, and debt.[10]

Through the diligence process, Riot learned about Whinstone's hosting agreements and its associated accounting practices.[11] Whinstone's contract with SBI required SBI to make a one-time advance payment to Whinstone, which Whinstone

---

[6] Pl.'s Ex. 9 (SBI Hosting Service Agreement dated Oct. 24, 2019); Pl.'s Ex. 10 (Rhodium Hosting Agreement dated June 30, 2020); *see also* Pl.'s Ex. 12 (December 2020 contract consolidating the Rhodium June contract with others executed in July).

[7] Pl.'s Ex. 15 at '605.

[8] Compl. ¶¶ 1, 10; Answer ¶¶ 1, 10.

[9] *See* Pl.'s Ex. 14 (outline of responses to EY diligence requests).

[10] *Id.*

[11] *See id.*; Pl.'s Ex. 15 at '605 ("All but one of Whinstone's three customers are billed in arrears – this customer has paid in advance for services / pays in advance billings for additional services (resulting in recognition of deferred revenue).").

recorded as deferred revenue for accounting purposes.[12] Rhodium's contract, by contrast, did not involve a one-time payment to Whinstone.[13] Whinstone instead recognized revenue from Rhodium as it was received.[14]

## B. The Stock Purchase Agreement

In early 2021, Riot, Northern Data, and their counsel negotiated Riot's purchase of Whinstone.[15] The parties signed a final Stock Purchase Agreement (the "SPA") on April 8, 2021.[16] Riot agreed to acquire from Northern Data all of Whinstone's outstanding stock for a combination of stock and cash consideration.[17] Stock—11.8 million shares of Riot's outstanding corporate stock, valued at approximately $571 million—accounted for most of the consideration.[18]

---

[12] Pl.'s Ex. 9.

[13] Pl.'s Exs. 10, 12.

[14] *See* Pl.'s Ex. 3 (report of Northern Data's expert) ("Hull Rep.") ¶ 13 ("[T]he services provided to one of Whinstone's customers, SBI, involved an advance payment that was recognized as deferred revenue . . . Based upon the absence of a Rhodium liability, payments received from Rhodium during 2020 were not recognized as deferred revenue."); Pl.'s Ex. 16 at '483 (email exchange between Mazars and Northern Data's investment bank where Mazars explained that "[i]n 2019 one of [Whinstone's] customers SBI advanced money to [Whinstone] for future services," resulting in deferred revenue).

[15] *See* Pl.'s Exs. 17-18 (earlier drafts of the SPA); Compl. Ex. B (final Stock Purchase Agreement, dated April 8) ("SPA").

[16] Compl. ¶ 1; Answer ¶ 1.

[17] Compl. ¶ 13; SPA § 2.2(a).

[18] SPA at B-19 (defining the "[s]hare [c]onsideration" as 11,800,000 Riot common shares); *see* Pl.'s Ex. 7 (Northern Data press release identifying Riot's share price as $48.37 on April 8, 2021). $48.37 x 11,800,000 = $570,766,000.

4

Only the cash consideration remains at issue. It was $80 million with four possible purchase price adjustments ("PPA"): (1) the "Final Net Working Capital Adjustment"; (2) "Final Closing Indebtedness"; (3) "Final Closing Cash"; and (4) "Final Transaction Expenses."[19] The adjustments for net working capital and indebtedness are relevant here.

The SPA contemplates multiple types of potential post-closing disputes. One pathway is the PPA process, which is addressed in Article II of the SPA. Alternatively, for representation and warranty claims, Article IX outlines an indemnification process with a damages cap.

---

[19] SPA § 2.2(a) (explaining that the cash consideration would be adjusted as follows: "*plus* (ii) the Final Net Working Capital Adjustment, *minus* (iii) the Final Closing Indebtedness, *plus* (iv) the Final Closing Cash, *minus* (v) the Final Transaction Expenses"). Appendix B to the SPA defines each of these terms. The Final Net Working Capital Adjustment is equal to Final Net Working Capital less $3,879,178 (and may be negative). *Id.* at B-9, B-21. Final Net Working Capital is, as of the Final Closing Statement:

> [T]he consolidated current assets of [Whinstone and its subsidiaries] (excluding [] Energy Credits, any intercompany receivables between [Whinstone and its subsidiaries] *minus* the consolidated current liabilities of the [Whinstone and its subsidiaries] (excluding any intercompany payables or accruals between [Whinstone and its subsidiaries], the Closing Target Company Indebtedness and the Target Company Transaction Expenses), in each case as determined in accordance with GAAP and in a manner in accordance and consistent with the Illustrative Closing Statement.

*Id.* at B-9, B-12. Final Closing Target Company Indebtedness means Target Company Indebtedness as of the Final Closing Statement and "as determined in a manner in accordance and consistent with the Illustrative Closing Statement," excluding "intercompany indebtedness, obligations or liabilities between [Whinstone and its subsidiaries,] . . . or [] amounts included in the Net Working Capital or the Target Company Transaction Expenses. *Id.* at B-2, B-9, B-20.

5

## 1. The Purchase Price Adjustment Process

Section 2.2(b) of the SPA directed Northern Data to provide at least three business days before closing an "Estimated Closing Statement," which would serve as the baseline calculation for each of the components to the PPA.[20]

Section 2.3 of the SPA sets a process for resolving any dispute over the purchase price after delivery of the Estimated Closing Statement. First, Riot had to deliver a "Proposed Final Closing Statement" to Northern Data within 75 days of closing.[21] The delivery of the Proposed Final Closing Statement would start the clock on a 60-day review period, during which Northern Data would have reasonable access to Riot's books and records.[22] Within that same period, Northern Data could send Riot a written "Statement of Objections" to the Proposed Final Closing Statement, "setting forth each disputed matter and the basis for [Northern Data's] objections thereto in reasonable detail."[23] That Statement of Objection would trigger Riot and Northern Data's obligations to "negotiate in good faith to resolve such objections."[24] If the parties were unable to resolve their PPA dispute, then either

---

[20] *Id.* § 2.2(b); *see also id.* § 2.6(a)(1).

[21] *Id.* § 2.3(a).

[22] *Id.*

[23] *Id.* § 2.3(a)-(b). Should Northern Data fail to deliver a Statement of Objections, the Proposed Final Closing Statement would be deemed accepted. *Id.* § 2.3(b).

[24] *Id.* § 2.3(b).

6

party could submit "unresolved matters" in the Statement of Objections to an independent "Accounting Expert" for resolution.[25]

Section 2.3(c) of the SPA establishes the Accounting Expert's authority and obligations:

> The Accounting Expert shall, limiting its review to such unresolved matters that were properly included in the Statement of Objections and acting as an expert and not as an arbitrator, resolve such unresolved matters only and make any requisite corresponding adjustments to the Proposed Final Closing Statement, in each case in accordance with GAAP, in a manner in accordance and consistent with the Illustrative Closing Statement and pursuant to the terms of this Agreement.[26]

### 2. Indemnification

Article IX of the SPA prescribes and limits the remedies available for any breach of the SPA. Section 9.7 states that:

> Except in the case of Fraud, adjustments to the Estimated Cash Consideration pursuant to Section 2.3, and as set forth in Section 6.21 [pertaining to energy credits] and Article VIII [pertaining to tax matters], each Party acknowledges and agrees that following the [c]losing, the indemnification provisions set forth in [] Article IX [of the SPA] . . . shall provide the sole and exclusive remedies arising out of or in connection with any breach or alleged breach of any representation, warranty, covenant or other agreement [in the SPA], as applicable.[27]

---

[25] *Id.* § 2.3(c).

[26] *Id.*

[27] *Id.* § 9.7; *see also id.* at B-9 (defining "Fraud").

7

Section 9.4 establishes that indemnifiable damages are capped at $2,657,198.[28]

Section 9.9 prevents a double recovery from both indemnification the PPA process.[29]

## C. The Purchase Price Adjustment Dispute

Shortly before closing, Northern Data gave Riot an Estimated Closing Statement setting out its "good faith estimate" of each component of the cash consideration.[30] Northern Data determined that the "Estimated Cash Consideration" totaled $54,454,638, including an amount paid in satisfaction of an existing intercompany loan, but exclusive of Final Transaction Expenses yet to be calculated.[31] After accounting for Final Transaction Expenses of $1,642,436, Riot paid $52,812,202 at closing on May 26.[32]

---

[28] *Id.* § 9.4.

[29] *Id.* § 9.9 ("No Party shall be entitled to be indemnified, defended, held harmless or reimbursed for, from or against any Damages (and such Damages shall not be counted against the Threshold or any other limitation to indemnification hereunder) pursuant to this Article IX if such Damages are accounted for in the calculation of the Final Net Working Capital, the Final Closing Indebtedness, the Final Closing Cash or the Final Transaction Expenses.").

[30] Defs.' Ex. 9 ("Estimated Closing Statement").

[31] In its Estimated Closing Statement, Northern Data applied the formula detailed *supra* note 19 and determined cash consideration was $17,106,664, excluding Final Transaction Expenses. *See* Estimated Closing Statement '974 (calculating Base Cash Consideration of $80,000,000, *plus* Final Net Working Capital Adjustment of $6,046,084, *minus* Final Closing Indebtedness of $78,123,175, *plus* Final Closing Cash of $9,183,754). Northern Data also determined that Riot owed $37,182,974 in satisfaction of an intercompany loan and interest, plus accrual on an intercompany account equal to $165,000. *Id.*; *see also* SPA § 6.14(a) (providing for the satisfaction of "[i]ntercompany [p]ayables" at closing).

[32] *See* Compl. ¶ 2 (providing the date of closing); Answer ¶ 2 (same); Defs.' Ex. 11 ("Proposed Final Closing Statement") 1 (noting the total amount wired by Riot to Northern

8

On August 6, Riot timely delivered its Proposed Final Closing Statement to Northern Data.[33] Riot's proposed adjustments to the Estimated Cash Consideration totaled $29,981,589.[34] Most of this amount was due to Riot's determination that Final Closing Indebtedness should be increased by $28,718,746, which would decrease the purchase price by the same amount.[35]

Northern Data then had 60 days to review the Proposed Final Closing Statements and Riot's books and records, and—if it chose—submit a Statement of Objections.[36] On September 30, Northern Data timely provided a Statement of Objections to Riot, which disputed Riot's accounting for seven items.[37] Four are at issue here:

- Disputed Item 1: Riot's Net Working Capital adjustment from Whinstone's alleged double-billing of Rhodium for construction and site services (totaling $1,200,343), which Northern Data had included in Whinstone's accounts receivable balance as of closing;[38]

- Disputed Item 2: Riot's recognition of deferred revenue in connection with services Whinstone completed before closing

Data upon closing). The Final Transaction Expenses included various advisor, audit, and insurance fees. *See* Proposed Final Closing Statement; *see also id.* at tbl. C.

[33] *See generally* Proposed Final Closing Statement.

[34] *Id.* at 1; *see supra* note 21 and accompanying text (outlining this step in the PPA process).

[35] Proposed Final Closing Statement 1.

[36] *See supra* note 22-23 and accompanying text.

[37] Defs.' Ex. 12 ("Statement of Objections").

[38] *Id.* at '060.

for a Rhodium Bitcoin mining data center (totaling $6,435,183, net of revenue amortization);[39]

- Disputed Item 3: Riot's recognition of deferred revenue in connection with services Whinstone rendered before closing for a separate Rhodium Bitcoin data mining center (totaling $16,055,773);[40] and

- Disputed Item 4: Riot's treatment of electricity costs that Whinstone incurred before closing as accounts payable—a type of liability and thus a negative purchase price adjustment (totaling $2,623,999).[41]

## D. The Prior Action

The parties engaged in discussions for several months after Northern Data delivered its Statement of Objections. They were unable to resolve their dispute on several issues related to the PPA process and on energy credits Northern Data claimed were due under the SPA in related litigation. In September 2022, Riot filed

---

[39] *Id.* at '060-061; *see* Proposed Final Closing Statement tbl. B. The deferral increased Whinstone's net debt position by the same amount. *See infra* note 67 and accompanying text.

[40] Statement of Objections '061.

[41] *Id.* at '062. Riot calculated a liability of $2,918,442 that it contends should have been included at closing, along with adjustments for March through May 2021 (including two adjustments attributable to electricity usage in May). These adjustments total -$295,043, such that the final liability calculation is $2,623,399. *See* Proposed Final Closing Statement tbl. B. In its Statement of Objections, Northern Data argued that the original amount of $2,918,442 should not have been included in accounts payable because it was used to offset another payment. *See infra* notes 135-136 and accompanying text. But it agreed that if the invoice was included, the adjustments were "acceptable in principle." Statement of Objections '062.

10

litigation in this court (the "Prior Action"), asking that Northern Data be compelled to submit disputed matters to an accounting expert.[42]

The parties settled the Prior Action on March 22, 2023.[43] Their Settlement Agreement required the parties to engage an independent Accounting Expert.[44] The parties also agreed that the only matters eligible for submission to the Accounting Expert were those identified in the Proposed Final Closing Statement, the Statement of Objections, and Riot's responses to the Statement of Objections.[45]

On March 21, 2023, the parties filed a stipulation to dismiss the Prior Action, which was entered as an order of the court.[46] It stated that the Settlement Agreement "intended to fully and finally resolve th[at] litigation and provid[e] a path toward the ultimate resolution of certain disputed accounting matters by a mutually agreed upon independent accountant."[47]

### E. The Accounting Expert's Determination

On March 17, 2023, the parties engaged a certified public accountant to serve as the Accounting Expert and resolve "the disputed matters" in Northern Data's

---

[42] *See* Compl., *Riot Platforms, Inc. v. N. Data AG*, C.A. No. 2022-0792-LWW (Del. Ch.) (the "Prior Action").

[43] *See* Defs.' Ex. 18 ("Settlement Agreement").

[44] *Id.* § 3(a); *see supra* note 25 and accompanying text (noting this SPA requirement).

[45] Settlement Agreement § 3(d).

[46] Prior Action, Dkts. 37-38; *see* Defs.' Ex. 19.

[47] Defs.' Ex. 19 at 1.

Statement of Objections.[48]  A few weeks later, on April 5, they delivered their initial briefs to the Accounting Expert, which addressed Disputed Items 1 through 4.[49]  The parties also each submitted a rebuttal brief on April 26.[50]  The Accounting Expert directed questions at both parties and requested documents, including a copy of the "Illustrative Closing Statement" included as Exhibit 1 to the SPA.[51]  The parties responded to the Accounting Expert's questions and filed final reply briefs.[52]

The Accounting Expert issued his decision on June 9, 2023 (the "Determination").[53]  He found in Riot's favor on Disputed Items 1 through 4.[54]

### F.    This Litigation

Northern Data initiated this litigation against Riot and Whinstone on June 23, 2023.[55]  It seeks to vacate the Accounting Expert's Determination on Disputed Items 1 through 4.[56]

---

[48] Defs.' Ex. 17 (engagement agreement with Credibility International, a forensic accounting firm employing Steven F. Stanton, a certified public accountant who served as the Accounting Expert).

[49] Defs.' Ex. 20 (Riot's initial brief); Defs.' Ex. 21 (Northern Data's initial brief).

[50] Defs.' Ex. 22 (Riot's rebuttal brief); Defs.' Ex. 23 (Northern Data's rebuttal brief).

[51] Defs.' Ex. 24; *see* SPA Ex. 1 (Illustrative Closing Statement); *see also* Compl. ¶ 29.

[52] Defs.' Ex. 25 (Riot's responses to questions); Defs.' Ex. 26 (Northern Data's responses to questions); Defs.' Ex. 27 (Riot's reply brief); Defs.' Ex. 28 (Northern Data's reply brief).

[53] Compl. Ex. A ("Determination").

[54] *Id.* ¶¶ 7, 85-86.

[55] Dkt. 1.

[56] Compl. 18-19 (Prayer for Relief).

Riot and Whinstone (together, "Riot")[57] moved to dismiss the Complaint on July 17, 2023.[58]  After briefing and oral argument, I denied the motion to dismiss in a May 17, 2024 bench ruling.[59]  Focused fact and expert discovery ensued.[60]  The parties then cross-moved for summary judgment.[61]  Oral argument was presented on February 17, 2025.[62]

## II.  ANALYSIS

Under Court of Chancery Rule 56, summary judgment is granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[63]  "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact."[64]

---

[57] Since Riot and Whinstone have jointly defended this action, I refer to them collectively as "Riot" for the sake of simplicity.

[58] Dkts. 5, 8.

[59] Tr. of Rulings of the Court on Defs.' Mot. to Dismiss the Verified Compl. (Dkt. 29) ("Mot. to Dismiss Tr.") 24.

[60] Dkt. 32 (case schedule).

[61] N. Data AG's Mot. for Summ. J., filed on Behalf of Pl. N. Data, AG (Dkt. 48) ("Pl.'s Opening Br."); Riot Platforms, Inc. and Whinstone U.S., Inc.'s Mot. for Summ. J. Against the Verified Compl. of N. Data AG to Vacate Acct. Expert Determinations (Dkt. 51) ("Defs' Opening Br.").

[62] Tr. of Oral Args. on Cross-Mots. for Summ. J. (Dkt. 70) ("Summ. J. Tr.").

[63] Ct. Ch. R. 56(c).

[64] *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldgs. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

The parties have cross-moved for summary judgment on all three counts of Northern Data's Complaint. Count I concerns Disputed Items 2 and 3.[65] Counts II and III concern Disputed Items 1 and 4.[66] I address the parties' arguments in the same groupings. Riot is entitled to summary judgment on Count I; Northern Data is entitled to summary judgment on Counts II and III.

## A.    Disputed Items 2 and 3

Disputed Items 2 and 3 relate to the accounting for approximately $22 million of upfront payments Whinstone received from Rhodium—specifically, whether the payments should be recognized as deferred revenue as of closing. If the payments were recognized as deferred revenue, Target Company Indebtedness would increase and the cash consideration due to Northern Data would correspondingly decrease.[67]

The payments for capital expenditures, which Whinstone characterized as "Engineering Services," were made under long-term hosting agreements Whinstone and Rhodium executed in 2020.[68] Under those contracts, Whinstone agreed to

---

[65] Compl. ¶¶ 47-49.

[66] *Id.* ¶¶ 53-55, 58-59.

[67] Determination ¶ 26 (noting that "[d]eferred revenue falls within the definition of Target Company Indebtedness").

[68] *See supra* note 13 and accompanying text. The contracts initially described the payments as "Capital Expenditures" but later changed the characterization to "Engineering Services." Defs.' Ex. 30 (Northern Data Request for Admission Responses, Nos. 4, 16).

"host" Rhodium's equipment in Whinstone's data center for ten years.[69]  While

Rhodium made the payments to Whinstone, the data center remained under

construction.  The Accounting Expert summarized the issue as follows:

> During [Northern Data's] ownership, Whinstone recognized the $6,715,182 of capital expenditures incurred in the Building C Expansion [Disputed Item 2] and the $16,055,773 of capital expenditures incurred in the 70 MW Expansion [Disputed Item 3] as revenue from Engineering Services under the milestone method.  Under this accounting treatment, the completion of each 10 MW of capacity was deemed to be a milestone.  After [c]losing and during [Riot's] ownership, Whinstone recognized the capital expenditures for the [e]xpansions as deferred revenue to be recognized over the ten-year Hosting Services period.[70]

The parties disagree about whether the Engineering Services Whinstone

provided under its contracts with Rhodium were "distinct performance obligations"

from the "Hosting Services" Whinstone also performed for Rhodium.[71]  If the

---

[69] Pl.'s Ex. 10 § 4 ("Whinstone agrees that the Capital Expenditure allows [Rhodium] complete use of the Licensed Area for a continuous, uninterrupted period of ten (10) years, unless otherwise mutually agreed upon by both [p]arties in writing at a later date."); Pl.'s Ex. 12 § 3.18 ("Whinstone agrees that the Capital Expenditure allows [Rhodium] complete use of the Licensed Area for a continuous, uninterrupted period of ten (10) years, unless otherwise mutually agreed upon by both Parties in writing at a later date."); *see also* Defs.' Ex. 30 (Northern Data Request for Admission Responses) Nos. 5, 9, 17.

[70] Determination ¶ 24.

[71] *Compare id.* ¶ 27 ("The Seller's main contention is that the Engineering Services for the Expansions are distinct performance obligations separate from the Hosting Services under the Rhodium Contracts and that these Engineering Services transferred to Rhodium as the Expansions occurred."), *with id.* ¶ 34 ("The Purchaser's main contention is that the Engineering Services and Hosting Services are not distinct performance obligations and that the Rhodium capital expenditure payments should be recognized as revenue over the ten-year hosting period.").

15

Engineering Services were distinct from the Hosting Services—as Northern Data argues—the relevant revenue was recognized pre-closing when Whinstone received it from Rhodium. But if those Engineering Service were "actually prepayments for the Hosting Services"—as Riot argues—the revenue should be deferred over the ten-year hosting period.[72]

Section 2.3(c) of the SPA required the Accounting Expert to resolve this issue "in accordance with GAAP, in a manner in accordance and consistent with the Illustrative Closing Statement and pursuant to the terms of [the SPA]."[73] Northern Data contends that the Accounting Expert's decision should be vacated because the he considered Disputed Items 2 and 3 only under GAAP, ignoring Whinstone's historical practices for recording revenue as reflected in the balance sheet attached to the Illustrative Closing Statement.[74]

Riot, for its part, first insists that the SPA obligated the Accounting Expert to comply with GAAP as a starting point before considering the Illustrative Closing Statement.[75] It highlights that, after the expert concluded the Engineering Services for Rhodium were not distinct from Hosting Services, GAAP required that the

---

[72] This follows from "step five" of the applicable GAAP standard, which directs an entity to "[r]ecognize revenue when (or as) the entity satisfies a performance obligation." *See infra* note 99 and accompanying text.

[73] SPA § 2.3(c); *see also supra* note 26 and accompanying.

[74] Pl.'s Opening Br. 17, 19.

[75] Defs.' Opening Br. 21-28.

payments be recorded as deferred revenue. It further asserts, in the alternative, that the Accounting Expert's determination accords with both GAAP and the Illustrative Closing Statement.[76]

Because Riot's first argument is dispositive, I need not reach the second.

### 1. Standard of Review

The parties agreed in Section 2.3(c) of the SPA that the Accounting Expert would serve "as an expert and not as an arbitrator."[77] They also agreed that the Accounting Expert's resolution of the disputed matters would "be final and binding . . . , absent manifest error of the Accounting Expert."[78]

In *Terrell v. Kiromic Biopharma, Inc.*, the Delaware Supreme Court considered the distinction between judicial review of an expert determination and an arbitration award.[79] Interpreting language similar to that in Section 2.3(c) of the SPA, *Terrell* explained that because an expert's "authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact[,] . . . the expert's determination of the disputed factual issue will be final and binding on [the parties]."[80]

---

[76] *Id.* at 28-36.

[77] SPA § 2.3(c).

[78] *Id.*

[79] 297 A.3d 610 (Del. 2023).

[80] *Id.* at 618 (citing *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 464 (Del. Ch. 2018)). In its answering brief, Northern Data asserts that a *de novo* standard

17

Applying *Terrell* here, the Accounting Expert's judgments are subject to a manifest error standard to the extent he was acting within his authority.[81] But any legal determinations by the Accounting Expert are subject to a non-deferential review because he lacked "the authority to make binding decisions on issues of law or legal claims, such as legal liability."

Both standards necessarily play a role in my review of the Accounting Expert's Determination on Disputed Items 2 and 3. Resolving whether Section 2.3(c) of the SPA required the Accounting Expert to give GAAP and the Illustrative Closing Statement equal weight, for example, involves a legal assessment that I undertake *de novo*.[82] But to the extent that the Accounting Expert acted consistent

---

applies to the entire analysis under the law of the case doctrine. N. Data AG's Answering Br. in Opp'n to Defs.' Mot. for Summ. J. (Dkt. 59) 6-7. It relies on my ruling denying Riot's motion to dismiss, where I observed that under *Terrell*, a court will "review an expert's legal determinations and interpret the operative agreements under a *de novo* standard of review." Mot. to Dismiss Tr. 12. In that ruling, I noted that reviewing the SPA's terms to assess the expert's authority as set out in Section 2.3(c) would likely also involve a non-deferential standard of review. *Id.* at 22-23. I did not, however, hold that the contractual manifest error standard was inapplicable to reviewing factual or accounting matters within the expert's purview. At oral argument on the summary judgment motions, Northern Data's counsel acknowledged that the manifest error standard would apply if, for example, I was considering whether a matter "was GAAP compliant." Summ. J. Tr. 8-9.

[81] *See supra* note 78 and accompanying text.

[82] *See ArchKey Intermediate Hldgs. Inc. v. Mona*, 302 A.3d 975, 997 (Del. Ch. 2023) (discussing how principles of contract interpretation may apply to expert determinations).

with his contractual mandate, I review his factual findings under the contractual manifest error standard.[83]

### 2. The Expert's Contractual Mandate

Section 2.3(c) of the SPA states that the Accounting Expert's decision must be "in accordance with GAAP, in a manner in accordance and consistent with the Illustrative Closing Statement and pursuant to the terms of th[e] [SPA]."[84] Northern Data asserts that this provision required consistency with each of (1) GAAP, (2) the Illustrative Closing Statement, and (3) the SPA.[85] Riot, for its part, maintains that the provision creates a hierarchy: the Accounting Expert's determination must first be "in accordance with GAAP," but if GAAP allows for multiple approaches, then the Accounting Expert must choose the one consistent with the Illustrative Closing Statement.[86]

"Delaware law adheres to the objective theory of contracts," meaning that "a contract's construction should be that which would be understood by an objective, reasonable third party."[87] The court must "'give each provision and term effect' and

---

[83] *See supra* note 81 and accompanying text.

[84] SPA § 2.3(c).

[85] Pl.'s Opening Br. 19.

[86] Defs.' Opening Br. 21.

[87] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)). The SPA is governed by Delaware law. *See* SPA § 11.6(a).

not render any terms 'meaningless or illusory.'"[88]  "If parties introduce conflicting interpretations of a term, but one interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute, the court may, as a matter of law and without resorting to extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation."[89]  Here, Riot's interpretation is the only reasonable one.

The Court of Chancery's decision in *ArchKey Intermediate Holdings, Inc. v. Mona* is informative in interpreting the SPA's description of the Accounting Expert's mandate.[90]  Similar to this dispute, *ArchKey* involved an agreement that an accounting expert would resolve a PPA dispute "in accordance with GAAP and consistent with the past practices of the [c]ompany and [a specified historical balance sheet]."[91]  Relying on a professional guide to accounting arbitrations in mergers and acquisitions disputes, the court explained that GAAP compliance was the "floor" and the requirement of consistency with the historical balance sheet "narrow[ed]"

---

[88] *Manti Hldgs, LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021) (citing *Osborn*, 991 A.2d at 1159).

[89] *Wills v. Morris, James, Hitchens & Williams*, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[90] 302 A.3d 975 (Del. Ch. 2023); *see* SPA § 2.3(c).

[91] *ArchKey*, 302 A.3d at 999.

the expert's "available choices under GAAP."[92]  If the company's historical balance sheet complied with GAAP, the same method would be applied in the PPA process. But if the historical practice was noncompliant with GAAP, it could not be used in the PPA process.[93]

Thus, I must assess whether GAAP permits discretion on how to record the deferred revenue from Rhodium.  If there are multiple ways to apply GAAP, Section 2.3(c) requires the Accounting Expert to adopt the approach most consistent with the Illustrative Closing Statement.  If, however, the Accounting Expert took the only GAAP-compliant approach to recognizing the revenue on the Rhodium contracts, then he did not commit an error warranting vacatur.[94]

---

[92] *Id.* (stating that "GAAP by itself is not narrowly prescriptive on many accounting topics [but] provides companies with many acceptable accounting choices" (quoting A. Vincent Biemans & Gerald M. Hansen, *M&A Disputes: A Professional Guide to Accounting Arbitrations* 31 (2017)).

[93] *Id.* at 1000 (explaining that "if the [c]ompany used a method in the [historical balance sheet] that would have complied with GAAP for purposes of preparing the [adjusted closing balance sheet], then the [p]urchaser was obligated use that same method . . . Conversely, if the [c]ompany used a method—either historically or for the [historical balance sheet]—that would not comply with GAAP for purposes of preparing [an] [a]djusted [c]losing [b]alance [s]heet, then the [p]urchaser could not continue to use that method").

[94] I take no position on whether the Accounting Expert's Determination was consistent with the Illustrative Closing Statement.  I acknowledge, however, that a possible result of the hierarchal approach I apply here is that, if the Illustrative Closing Statement was not GAAP-compliant, the Accounting Expert would be unable to adopt it.  This is a feature, not a bug.  The language specifying that purchase price adjustments must comply with GAAP can protect the buyer by providing "a contractual basis to challenge [an] additional payment" where the seller's historical practices were noncompliant with GAAP and such

21

### 3. Application of ASC 606

The Accounting Expert's analysis of Disputed Items 2 and 3 turned on whether the Engineering Services included in the contracts between Whinstone and Rhodium were distinct from the underlying Hosting Services.[95] Under Accounting Standard Codification Topic 606 ("ASC 606")— the applicable GAAP standard for revenue recognition[96]—if the Engineering Services and Hosting Services are distinct, then Whinstone may recognize payments for Engineering Services as income when they are provided.[97] Conversely, under ASC 606, if the services were not distinct, then payments for Engineering Services must be recorded as deferred revenue recognized alongside the Hosting Services as the Hosting Services are provided.[98]

ASC 606 contemplates a five-step process that an entity should follow in recognizing revenue: (1) "[i]dentify the contract(s) with a customer"; (2) "[i]dentify the performance obligations in the contract"; (3) "[d]etermine the transaction price"; (4) "[a]llocate the transaction price to the performance obligations in the contract";

---

information is revealed after closing. *ArchKey*, 302 A.3d at 999 (quoting Biemans & Hansen, *supra* note 92, at 31).

[95] Determination ¶ 45; *see also supra* notes 71, 105 and accompanying text.

[96] Both parties agreed that ASC 606 was the correct standard to apply. *See* Defs.' Ex. 20 ¶ 78; Defs.' Ex. 21 at 4; *see also* Hull Dep. 11-12.

[97] Determination ¶¶ 25, 45, 50.

[98] *Id.*

and (5) "[r]ecognize revenue when (or as) the entity satisfies a performance obligation."[99]

The critical factor is step two. Under GAAP, a "performance obligation" is defined as "a good or service (or a bundle of goods or services) that is distinct."[100] ASC 606 explains:

> If [the identified] goods or services are distinct, the promises are performance obligations and are accounted for separately. A good or service is distinct if the customer can benefit from the good or service on its own or together with other resources that are readily available to the customer and the entity's promise to transfer the good or service to the customer is separately identifiable from other promises in the contract.[101]

When an entity receives a payment from a customer, the entity must allocate the payment to a "performance obligation" and recognize revenue when that "performance obligation" is satisfied."[102]

The Accounting Expert closely followed the methodology outlined in ASC 606. The "identified goods or services" in this case were the Engineering Services provided under the Rhodium contracts.[103] In his Determination, the

---

[99] Acct. Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, 606-10-05-4 (Fin. Acct. Standards Bd. 2014), https://storage.fasb.org/ ASU%202014-09_Section%20A.pdf ("ASC 606-10-05-4") 14-15.

[100] Decl. and Expert Rep. of Ted Stafford dated Sept. 17, 2024 (Dkt. 54) ("Stafford Rep.") ¶ 33 (Riot's expert, citing ASC 606-10-05-4).

[101] ASC 606-10-05-4 at 15.

[102] Stafford Rep. ¶ 33.

[103] *See supra* note 101 and accompanying text.

Accounting Expert observed that Northern Data's "main contention is that the Engineering Services for the Expansions are distinct performance obligations separate from the Hosting Services under the Rhodium [c]ontracts."[104] He stated that, "in assessing the technical accounting treatment under [the second step of] ASC 606 . . . the most pertinent question is whether the Engineering and Hosting Services could be categorized as distinct performance obligations."[105] He went on to answer this question by evaluating the "economic substance of the contracts" with Rhodium.[106] He concluded that:

> Based on the Parties' submissions and the associated documents . . . the Engineering Services and Hosting Services are not distinct performance obligations. Although the Rhodium Contracts classify the Engineering Services/Capital Expenditures separately from the Hosting Services, this appears to me to be a situation of form over substance. In substance, there is no asset or service of value that transfers to Rhodium for the Engineering Services.[107]

The Accounting Expert's determination that the performance obligations were not distinct was within the scope of his expertise. It is therefore entitled to significant deference.[108] The parties agreed in the SPA that the Accounting Expert's

[104] Determination ¶ 27.

[105] *Id.* ¶ 45.

[106] *Id.* ¶¶ 44, 46-49.

[107] *Id.* ¶ 46.

[108] *See supra* notes 80-81 and accompanying text (explaining that where parties contract to submit a dispute to an expert, they are bound by factual determinations on issues within the expert's field of expertise).

conclusions would not be overturned absent "manifest error."[109]   Under Delaware

law, "'manifest error' is most sensibly understood as a corollary to 'evident material

mistake.'"[110]   There is no material fact in the record suggesting that the Accounting

Expert committed any such error.

Northern Data asserts that the Accounting Expert nevertheless erred because

he neglected to consider the Illustrative Closing Statement.[111]   That argument is

based on the fact that the Determination does not mention the Illustrative Closing

Statement by name.[112]   The record, however, supports the opposite conclusion.   The

Accounting Expert specifically requested and received a copy of the Illustrative

Closing Statement, cited all party submissions (which included arguments on the

Illustrative Closing Statement) to him, and represented that his Determination was

"[b]ased on the Parties' submissions and the associated documents."[113]

Once the Accounting Expert applied his judgment under step two of ASC 606

and found that the Engineering and Hosting Services were not distinct performance

---

[109] SPA § 2.3(c); *see also supra* note 78 and accompanying text.

[110] *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *3 n.80 (Del. Ch. Aug. 9, 2012).

[111] *See* Pl.'s Opening Br. 18-22; *see also supra* note 83 (discussing the appropriate standard of review).

[112] *See Tikiob v. Tikiob-Carlson*, 2021 WL 4310513, at *3 (Del. Ch. Sept. 22, 2021) ("Mere allegations or denials in a pleading, unless backed up by specific facts contained in admissible evidence, are insufficient to show that there is a genuine issue for trial.").

[113] Determination ¶ 46; *see id.* ¶¶ 45, 47, nn.8 & 13; Compl. ¶ 29.

obligations, his discretion was constrained on how to recognize the revenue associated with the Engineering Services. GAAP then required that the payments be recorded as deferred revenue.[114] That is, the outcome of the Accounting Expert's factual determinations left him unable to conclude that Northern Data's position (which treated Engineering Services as a distinct performance obligation) was an acceptable methodology under GAAP.[115] GAAP mandates consistent accounting for contracts with similar characteristics.[116]

Accordingly, Northern Data's claim that the Accounting Expert deviated from the requirements of Section 2.3(c) fails as a matter of law. Riot is entitled to summary judgment in its favor on Count I.

## B. Disputed Items 1 and 4

The SPA sets out different tracks for how money can change hands after closing. One track is through indemnity claims for breaches of representations and warranties in the SPA. Under Section 9.7 of the SPA, "the indemnification

---

[114] Northern Data's expert recognized as much. Hull Dep. 132-33 (noting that there was only "one acceptable choice under GAAP" after completing ASC 606 step two); *id.* at 59 ("Q. You agree that GAAP requires bundling once there has been a determination by the person making the determination, that the engineering and hosting services are not distinct performance obligations? A. For that reporting entity.").

[115] *See* Hull Dep. 132; *see also* Determination ¶ 48 ("I believe that the engineering and hosting services are not capable of being distinct.").

[116] *See* Hull Dep. 79 (Q. [Y]ou agree that ASC 606-10-10-3 . . . requires treating contracts with similar characteristics similarly? A. If you conclude that, that they're similar, yes.").

provisions set forth in [] Article IX [of the SPA] . . . provide the sole and exclusive remedies arising out of or in connection with any breach or alleged breach" of a representation or warranty.[117] Alternatively, the parties may adjust the final merger consideration through the PPA process, which involves the terms of Section 2.3(c) discussed above.

These tracks have distinct functions. "Generally speaking, purchase price adjustments in merger agreements account for changes in a target's business between the signing and closing of the merger."[118] The point is to "keep[] all other variables constant in terms of accounting" to prevent parties from extracting value for which they did not bargain.[119] Relative to indemnification rights, the role of accounting true-up provisions is limited.

In Counts II and III of the Complaint, Northern Data alleges that Disputed Items 1 and 4 are indemnity issues that relate to representations and warranties rather than accounting methodologies.[120] It highlights that Disputed Items 1 and 4 concern pre-closing events. As a result, it argues that the Accounting Expert exceeded his

---

[117] SPA § 9.7; *see also id.* § 9.9 (preventing a double recovery from the indemnification and PPA processes). Aside from these two pathways, the SPA allows for adjustments with respect to energy credits and other tax matters. *See supra* note 29 and accompanying text.

[118] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 928 (Del. 2017).

[119] *Id.* at 929.

[120] Compl. ¶¶ 34-43; *see also* Pl.'s Opening Br. at 4; *see supra* notes 38, 41, and accompanying text (further describing Disputed Items 1 and 4).

authority by resolving Disputed Items 1 and 4 and that the Determination should be vacated on those issues.

Riot contests Northern Data's characterization of Disputed Items 1 and 4 and asserts that the main debate surrounding both issues is their proper accounting treatment. As a result, they say that the Accounting Expert was authorized to resolve these issues. Beyond the merits, they also raise three affirmative defenses that they believe prevent summary judgment in Northern Data's favor on Counts II and III.

My first task, then, is to assess whether Disputed Items 1 and 4 present indemnification claims or accounting disputes. Because resolving them hinges on the interpretation of the SPA's terms—a legal issue—the Accounting Expert's assessment is not entitled to deference.[121] I conclude that Disputed Items 1 and 4 pertain to representations and warranties in the SPA rather than to PPA matters. The Accounting Expert was not authorized to resolve these indemnification claims.

### 1. Disputed Items 1 and 4

Disputed Issue 1 involves an alleged double-billing of Rhodium. In January 2021, Whinstone invoiced Rhodium for approximately $1.2 million for transformers.[122] But in July, Whinstone determined that Rhodium had been double

---

[121] *See Terrell*, 297 A3d at 623.

[122] Defs.' Ex. 6.

billed because Rhodium had paid the amount owed using a "credit memo."[123] Riot alleged that because of the double billing, the invoice should not have been considered an accounts receivable asset at the time of closing.[124]

This dispute concerns whether Northern Data improperly represented the invoice as a bona fide receivable despite knowing that Rhodium had paid it. It directly implicates Section 4.21(a) of the SPA, which provides:

> All accounts receivable of [Whinstone and its subsidiaries] (i) *represent bona fide transactions* of [Whinstone and its subsidiaries] that arose in the ordinary course of business, (ii) are not subject to valid setoffs or counterclaims and (iii) are, to [Whinstone's] Knowledge, current and collectible in the ordinary course of business, except to the extent of reserves or reflected in the [Whinstone] Financial Statements.[125]

Disputed Item 4 involves a pre-closing outstanding invoice for electricity. In May 2021, Whinstone received an invoice from its electricity provider for nearly $3 million in electricity charges from February.[126] In its Statement of Objections, Northern Data asserted that this amount should not be included in accounts payable

---

[123] *See* Defs.' Ex. 10 (email from Whinstone CEO regarding the alleged double-billing).

[124] *See* Determination ¶¶ 14-19; Pl.'s Ex. 24 ¶ 13 (arguing that "because the invoice was wrongly billed [it] did not represent a current asset under GAAP at the time of [c]losing and was erroneously recorded in Accounts Receivable").

[125] SPA § 4.21(a) (emphasis added).

[126] Defs.' Ex. 20 ¶ 164; Defs.' Ex. 26 at 13. According to Northern Data, Whinstone reached a settlement with its electricity provider in which the provider agreed to compensate Whinstone for underusage of electricity in February 2021 and to reduce the sum Whinstone owed under the settlement by the amount of the invoice. *See* Statement of Objections '062.

because the invoice erroneously sought a payment Northern Data believed Whinstone had already made.[127] But Riot argued that the invoice remained due and that Whinstone should have included the charges in the calculation of Target Company Indebtedness—that is, as a liability.[128]

This issue implicates Section 4.4(b) of the SPA, which provides:

> Section 4.4(b) of [Whinstone]'s Disclosure Letter sets forth a true and complete list of each item of the [Whinstone] Indebtedness as of the date hereof. Neither the [Whinstone] nor [its subsidiaries] [are] in default and no payments are past due with respect to any [Whinstone] Indebtedness, in each case, in any material respect.[129]

The SPA defines "Target Company Indebtedness" to include "obligations in respect of accounts payable outstanding and aged over 90 days."[130] The relevant liability was for electricity charges incurred more than 90 days before closing.[131]

### 2. The Accounting Expert's Authority

Neither Disputed Item 1 nor Disputed Item 4 involves a "change[] in [Whinstone's] business between the signing and closing" of the SPA.[132] Accounting

---

[127] Defs.' Ex. 21 at 10; Defs.' Ex. 23 at 9; *see also* Defs.' Ex. 26 at 13.

[128] Determination ¶¶ 57-60; Defs.' Ex. 20 ¶¶ 160, 164.

[129] SPA § 4.4(b); *see also* Defs.' Ex. 23 at 9; Pl.'s Opening Br. 42.

[130] SPA B-20 (defining "Target Company Indebtedness").

[131] Defs.' Ex. 23 at 9.

[132] *Chi. Bridge*, 166 A.3d at 928 (citing ABA Model Stock Purchase Agreement with Commentary 64 (2d ed. 2010)).

methodologies, or their application, have no bearing on resolving either issue. These are indemnity claims that involve legal issues: whether Northern Data and Whinstone complied with the representations and warranties made in Sections 4.4 and 4.21 of the SPA.

The Accounting Expert lacked the authority to resolve such matters. He was permitted by the SPA to as an "expert, not an arbitrator."[133] Legal indemnity disputes are beyond his expertise.[134] In fact, the Determination acknowledged that he had no jurisdiction to resolve "legal arguments" because "it is not the purview of the Accounting Expert to decide what is allowable under the [SPA] and the PPA process."[135] He also noted that, according to Northern Data, Disputed Items 1 and 4

---

[133] SPA § 2.3(c).

[134] *See Chi. Bridge*, 166 A.3d at 931 (noting that the contract language that an "auditor was acting 'as an expert and not as an arbitrator' . . . has been read to narrow the scope of the expert's domain"); *see also Paul v. Rockpoint Grp., LLC*, 2024 WL 89643, at *10 (Del. Ch. Jan. 9, 2024) ("Using the word 'arbitrator' or 'arbitration' provides a strong signal that a legal arbitration is intended, just as using the phrase 'as an expert and not as an arbitrator' strongly signals an expert determination."); *AQSR India Priv., Ltd. v. Bureau Veritas Hldgs., Inc.*, 2009 WL 1707910, at *7 (Del. Ch. June 16, 2009) (emphasizing that the PPA provision was "not a broad alternative dispute resolution clause meant to direct all disagreements arising out of [an] [a]sset [p]urchase [a]greement to an arbitrator" but "limited to the "narrow circumstance of the parties having a disagreement over the contents of the final [c]losing [s]tatement generated at the end of [a] [r]eview [p]rocess").

[135] Determination ¶ 4.

fell "outside the scope of the Accounting Expert's Determination Report and the PPA process and are instead issues related to representations and warranties."[136]

Instead, Disputed Items 1 and 4 implicate the exclusive remedy clause in Section 9.7 of the SPA.[137] Section 9.7 states that any representation and warranty issues must be resolved through the SPA's indemnification provisions. The carve-out in Section 9.7 for "adjustments to the Estimated Cash Consideration pursuant to Section 2.3" is irrelevant because Section 2.3 only applies to matters that were "properly included" in the parties' PPA documents.[138] Disputed Items 1 and 4 were not. The indemnification cap in Section 9.4 of the SPA applies.[139]

If every indemnification claim related to an accounting matter could be resolved through the PPA process, the SPA's cap on indemnity damages would be meaningless. As the Delaware Supreme Court observed in *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, permitting parties to characterize claims for breaches of representations and warranties as accounting disputes would "render[] the [indemnification cap] meaningless and eviscerate[] the basic bargain

---

[136] *Id.* Still, the Accounting Expert proceeded to decide Disputed Items 1 and 4, claiming to do so "from an accounting perspective." *Id.*

[137] SPA § 9.7.

[138] *Id.* §§ 2.3(c), 9.7; *see also supra* note 27 and accompanying text (quoting Section 9.7).

[139] *See supra* note 28 and accompanying text.

between two sophisticated parties."[140]  Delaware courts have reached a similar conclusion in other decisions.[141]

This dispute over pre-closing obligations must proceed under SPA Sections 4.4 and 4.21.  Indemnification is the "sole and exclusive remedy."[142]  The Accounting Expert's decision on Disputed Items 1 and 4 is therefore vacated.

### 3.    Applicability of Affirmative Defenses

Riot advances three affirmative defenses that it believes prevent summary judgment in Northern Data's favor on Counts II and III.  It asserts that: (1) Northern Data waived its right to object to Disputed Items 1 and 4;[143] (2) these claims are barred by the doctrine of quasi-estoppel;[144] and (3) Northern Data released these claims in the Settlement Agreement to the Prior Action.[145]  None of these arguments succeed.

---

[140] *Chi. Bridge*, 166 A.3d at 932.

[141] *See OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, at 1094-95 (Del. Ch. 2006) (stating that a party cannot "bypass the contractual [i]ndemnification process . . . and then seek a gigantic [c]losing [a]djustment"); *cf. Golden Rule Fin. Co. v. S'holder Rep. Servs. LLC*, 267 A.3d 382 (Del. 2021) (TABLE) (holding that a change to historical accounting was permissible in part given the absence of a contractual limitation of liability for resolving indemnification claims).

[142] SPA § 9.7.

[143] Defs.' Opening Br. 55-63.

[144] *Id.* at 63-65.

[145] *Id.* at 65-68.

### a. Waiver

Riot argues that its summary judgment motion should be granted because Northern Data waived its right to claim that Disputed Items 1 and 4 fall outside the PPA process.[146] "'Waiver is the voluntary and intentional relinquishment of a known right' either conferred by statute or secured by contract."[147] It is "a unilateral action and depends on what one party intended to do, rather than upon what he induced his adversary to do, as in estoppel."[148]

"It is well settled in Delaware that contractual requirements or conditions may be waived,"[149] though "[t]he standard for finding waiver is quite exacting."[150] It requires that "(1) there is a requirement or condition to be waived; (2) the waiving party [] kn[ew] of the requirement or condition; and (3) the waiving party []

---

[146] *Id.* at 55.

[147] *In re Coinmint, LLC*, 261 A.3d 867, 893 (Del. Ch. 2021) (citing *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005)); *see also Realty Growth Invs. v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982).

[148] *Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs., Inc.*, 2010 WL 5276991, at *9 (Del. Ch. Dec. 17, 2010) (citation omitted); *see also id.* ("Unlike estoppel, waiver does not necessarily imply that one party to the controversy has been misled to his detriment in reliance on the conduct of the other party.").

[149] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005); *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529-30 (Del. 2011).

[150] *Am. Fam. Mortg. Corp. v. Acierno*, 640 A.2d 655, 1994 WL 144591, at *5 (Del. Mar. 28, 1994) (TABLE).

intend[ed] to waive that requirement or condition."[151] "The facts relied upon for proof must be unequivocal in character."[152]

The "sole and exclusive remedies" language in Section 9.7 establishes contractual rights subject to waiver, satisfying the first element.[153] And as a signatory to the SPA, Northern Data also knew of these rights.[154]

Yet I cannot reasonably conclude that Northern Data intended to relinquish these rights.[155] Northern Data argues that, though it raised these items in its Statement of Objections, it was unaware that Riot's positions implicated breaches of representations and warranties given the limited information available at the time.[156] The evidence supports this contention.

In its submissions to the Accounting Expert, Northern Data asserted that Disputed Items 1 and 4 should not be subject to the PPA process. In its opening

---

[151] *AeroGlobal Cap. Mgmt.*, 871 A.2d at 444 (explaining that waiver "implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights").

[152] *George v. Frank A. Robbino, Inc.*, 334 A.2d 223, 224 (Del. 1975).

[153] *See supra* note 27 and accompanying text (describing the relevant provisions).

[154] *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 477 (Del. 1991) (stating that a contracting party must "stand by the words of his contract"). In the Prior Action discussed in note 42 and the accompanying text above, Northern Data also accused Riot of trying to "circumvent the indemnification provisions in Article IX" (Defs.' Ex. 14 ¶ 39), showing awareness of these provisions before Disputed Items 1 and 4 were raised in the PPA process.

[155] *See supra* notes 126-127 and accompanying text.

[156] Pl.'s Opening Br. 51-53.

brief, Northern Data said regarding Disputed Item 1 that because the SPA "permits adjustments only for such accounting matters prior to the [c]losing, . . . [a]ny subsequent commercial arrangements or claims related to a third party such as Rhodium would . . . be subject to the [SPA's] indemnification provisions in Article IX, rather than to adjustment in the PPA process."[157]  Northern Data also said regarding Disputed Item 4 that because it had paid the relevant electricity charges, "such post-[c]losing conduct [would not] be appropriately included in the PPA."[158] And in its rebuttal brief, Northern Data wrote that "[Disputed Items 1 and 4] are not accounting disputes, but rather attempts by Riot to smuggle disputes about representations and warranties under the [SPA] into the accounting process."[159] Northern Data so frequently reiterated this position that the Accounting Expert acknowledged it in his Determination.[160]

---

[157] Defs' Ex. 21 at 3-4.  Northern Data also argued that "[a]ny actual or potential indemnification claims under the [SPA] are outside the purview of the PPA process pursuant to Section 2.3 and, therefore, may not be taken into account in th[e] proceeding." *Id.*; *see also id.* at 3 ("[E]ven if there were support [for the double-billing], it occurred subsequent to Closing and thus cannot be injected into the PPA process.").

[158] *Id.* at 10 (arguing that Northern Data would have no liability to Riot for this issue); *see also supra* note 126 (discussing Northern Data's position on this item).

[159] Defs.' Ex. 23 at 2; *see also id.* at 9 (explaining in depth its argument that Riot's claim regarding Disputed Item 4 amounts to a claim for a breach of the representation and warranty in Section 4.4(b) of the SPA).

[160] *See supra* notes 135-136 and accompanying text.

These repeated statements cut against any suggestion that Northern Data intended to waive its indemnification rights. The "quite exacting" standard to show waiver is unmet.[161]

### b. Quasi-Estoppel

Riot also argues that Northern Data's claims regarding Disputed Items 1 and 4 are barred by the doctrine of quasi-estoppel.[162] Quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken."[163] The party invoking quasi-estoppel must show that it would be "unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[164] "[T]he act of the party against whom the estoppel is sought must have gained some advantage for himself or produced some disadvantage to another."[165]

Riot avers that Northern Data received a benefit from the Settlement Agreement in the Prior Action: over $4 million and confirmation that the dispute resolution process would be limited to the issues raised in the parties' PPA

---

[161] *See supra* note 150 and accompanying text.

[162] Defs.' Opening Br. 63.

[163] *Pers. Decisions, Inc. v Bus. Plan. Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) (citation omitted), *aff'd*, 970 A.2d 256 (Del. 2009).

[164] *Id.*

[165] *Id.*

documents.[166]  Riot also says that Northern Data disadvantaged it by forcing it to undergo an "expensive and time-consuming" accounting proceeding only to raise the issues anew in this litigation.[167]  These arguments fall short of the high bar to show unconscionability.

"The doctrine of unconscionability stands as a limited exception to the law's broad support for freedom of contract."[168]  It is "traditionally defined as a contract 'such as no man in his senses and not under delusion would make on the one hand, and no honest or fair man would accept, on the other.'"[169]  Because Delaware courts are mindful that "subjecting negotiated bargains to the loosely constrained review of the judicial process" is "dangerous," the doctrine is invoked "with extreme reluctance and only when all of the facts suggest a level of unfairness that is unconscionable."[170]  "Courts are particularly reluctant to find unconscionability in contracts between sophisticated corporations."[171]  Unconscionability is generally

---

[166] *See supra* notes 43, 45, and accompanying text.

[167] Defs.' Opening Br. 64.

[168] *James v. Nat'l Fin., LLC*, 132 A.3d 799, 812 (Del. Ch. 2016).

[169] *Id.* at 813 (citing *Tulowitzki v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978)).

[170] *Ryan v. Weiner*, 610 A.2d 1377, 1380-81 (Del. Ch. 1992); *see also Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.*, 2002 WL 1558382, at *2 (Del. Ch. July 9, 2002) (holding that unconscionability was inapplicable where "[n]one of the terms of [an] [a]greement [we]re so shockingly one-sided as to warrant [such] a finding"); *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016) ("Unconscionability is a concept that is used sparingly.").

[171] *Golden Rule*, 267 A.3d at *5 (citing *Reserves Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119, at *9 (Del. 2014)); *see also Progressive Int'l*, 2002 WL 1558382, at *2 ("[I]t

found only where "[a] party with superior bargaining power used it to take unfair advantage of [its] weaker counterpart."[172]

Here, any benefit Northern Data may have received from settling the Prior Action is unlinked to its claims about Disputed Items 1 and 4. It is unfortunate that Riot was caused to relitigate issues addressed by the Accounting Expert. Still, this purported harm does not result from a stronger party taking advantage of a weaker counterpart or subjecting it to "terms . . . so one-sided as to be oppressive."[173] Given the lack of unconscionability, this affirmative defense fails.

### c. Release

Riot's final affirmative defense is that Northern Data released the claims in Counts II and III through the Settlement Agreement in the Prior Action.[174] "When determining whether a release covers a claim, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[175]

---

would be highly unusual for a court to conclude that the terms of a negotiated manufacturing agreement between two commercial entities were so fundamentally unfair that a court must act as a guardian for one of the parties.").

[172] *Graham v. State Farm Mut. Auto. Inc. Co.*, 565 A.2d 908, 912 (Del. 1989).

[173] *Id.*

[174] Defs.' Opening Br. 65.

[175] *Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2016 WL 6892802, at *8 (Del. Ch. Nov. 23, 2016) (citation omitted), *aff'd*, 172 A.3d 884 (Del. 2017).

The Settlement Agreement has a section called "Release of Claims," which states:

> As of the date of the execution of th[e] [Settlement] Agreement and the engagement agreement with the Accounting Expert, each Party fully and irrevocably releases any and all causes of action and claims that it asserted in the Litigation. For the avoidance of doubt, the [p]arties do not release any claims to enforce th[e] [Settlement] Agreement or any claims under the SPA that were not asserted in the Litigation . . . .[176]

The Settlement Agreement defines "Litigation" to refer to Riot's claims and Northern Data's counterclaims in the Prior Action.[177] Northern Data's counterclaims "asserted in the Litigation" concerned Riot's alleged withholding of energy credits as well as a claim arising from a lawsuit by GMO against Whinstone.[178]

This release is inapplicable to Counts II and III of the present Complaint for several reasons. For one thing, the Prior Action had nothing to do with Disputed Items 1 and 4. And the release applied only "as of the date of execution" of the Settlement Agreement.[179] At that point, the Accounting Expert had yet to issue his

---

[176] Settlement Agreement ¶ 6.

[177] *Id.* at 1 (Recitals).

[178] *See* Defs.' Ex. 14.

[179] *See supra* note 176 and accompanying text.

Determination. The release even states that the Settlement Agreement does not resolve any claim arising after execution.[180]

Riot argues otherwise because, in the Prior Action, Northern Data sought specific performance barring Riot "from improperly introducing any alleged indemnification claim in" the PPA process.[181] But the release in the Settlement Agreement only extends to "causes of action and claims."[182] Specific performance is neither. It is a form of relief.[183]

Accordingly, Counts II and III were not released by the Settlement Agreement in the Prior Action.

## III. CONCLUSION

Riot's motion for summary judgment on Count I is granted; Northern Data's cross-motion on Count I is denied. The Accounting Expert did not make a manifest error in resolving Disputed Items 2 and 3.

---

[180] Settlement Agreement ¶ 7(c) (noting "[f]or the avoidance of doubt" that "any claim that arises pursuant to th[e] [Settlement] Agreement or after the date of the execution of th[e] [Settlement] Agreement" "shall not be resolved").

[181] Riot Platforms, Inc. and Whinstone US, Inc.'s Response Br. in Supp. of their Mot. for Summ. J. (Dkt. 61) 62 (citing Defs.' Ex. 14 ¶¶ 60-62).

[182] Settlement Agreement ¶ 6.

[183] *See, e.g.*, *Addy v. Piedmonte*, 2009 WL 707641, at *23 (Del. Ch. Mar. 18, 2009) (explaining that requests for relief "are not claims in and of themselves, but types of remedies dependent on the viability and outcome of the underlying causes of action, such as those for breaches of contract and equitable fraud"); *Quadrant Structured Prods. Co., v. Vertin*, 102 A.3d 155, 203 (Del. Ch. 2014).

Northern Data's summary judgment motion on Counts II and III is granted; Riot's cross-motion on Counts II and III is denied. Northern Data is entitled to a declaration that the Accounting Expert exceeded his jurisdiction by deciding Disputed Issues 1 and 4, which are indemnification claims. The corresponding portion of the Determination is vacated.

Within 14 days, the parties must submit a proposed final order and judgment to implement this decision.